### PETERS et al. v. LEREW et al.

#### No. 10940.

Court of Civil Appeals of Texas. Galveston.
March 21, 1940.

Rehearing Denied April 25, 1940.

Carlos B. Masterson, of Angleton, and W. Noble Carl, Stewart & DeLange, and Albert J. DeLange, all of Houston, for appellants.

Hardway, Woodruff & Austin, of Houston, and A. R. Rucks and Robert M. Lyles, both of Angleton, for appellees.

CODY, Justice.

The Court instructed a verdict against plaintiffs, who have appealed.

The suit was brought by appellants against M. Lerew and wife, and against E. S. Loomis and John Owens to recover 1,117.71 acres of land in Brazoria County. The suit, in addition to being brought in formal trespass to try title, was brought by appellants to set aside a deed given by them to M. Lerew on January 3, 1934. Appellants alleged, as grounds to set aside such deed and for equitable relief: That in the middle of the year 1933 one Barth and one Sallee were acting as real estate agents for appellants; and that these two real estate agents associated with themselves one John Owen; and that John Owen associated with himself as a real estate agent E. S. Loomis; and that E. S. Loomis later associated with himself M. Lerew, to whom appellants executed the deed of January 3, 1934, aforesaid; and that each of said real estate agents became the agent of appellants to sell the land aforesaid, and owed appellants the good faith attached to such relationship. Appellants further alleged that Lerew, Loomis and Owen, while acting as apellants' agents, learned that the land was greatly more valuable than $15 an acre, the asking price, and learned of oil, gas and mineral leasing and developments likely to occur from which property would be worth greatly in excess of $15 per acre, but they corruptly concealed such knowledge from appellants. Appellants further allege Lerew, Loomis and Owen, while appellants' agents, conspired to obtain the property for themselves; that they made no good faith effort to sell such land, but misled appellants into believing the land was not salable at the asking price, and entered into this fraudulent scheme: Lerew was to act as purchaser and obtain the property at an inadequate price, and to give merely his promise to pay therefor, which promise was in fact worthless; that Owen and Loomis, though purporting to be appellants' agents, were to have an interest in the land when conveyed to Lerew and the profits derived from a re-sale thereof; and that Lerew, Owen and Loomis were to induce appellants to think the property could not be sold to others and induce such sale to be made to Lerew. Appellants then alleged the consummation of such fraudulent scheme and conspiracy, and that contemporaneously with the execution of the deed to Lerew, he gave a deed of trust to secure his notes, and entered into a written agreement to cultivate 150 acres of the land in cotton, and 50 acres in corn. Appellants ask for rescission, etc.

We believe that no serious contention is made that Loomis and Owen were hostile parties to appellants at the trial, except in form, and, as they have not appeared, their pleadings will not be given.

Appellees, Lerew and wife, answered by general demurrer, special exceptions, general denial, and plea of not guilty, and specially denied conspiracy and fraud, and that Loomis or Owen had any interest in the property or income to be derived from it, and that appellant Peters relied on his own judgment and knowledge of land; and that no one had any knowledge of oil value at the time; and that the sale was satisfactory to appellants; and pleaded a ratification; and further pleaded the two and four year statutes of limitation, and by way of cross-action sued in statutory trespass to try title to recover title and possession of the land.

Appellants then answered the Lerew pleading with a general demurrer, special exceptions, and specially denied any knowledge of the facts giving a right to rescind at the time they accepted payments, or any knowledge of oil possibilities, and pled reliance upon representations of Lerew, Loomis and Owen. Appellants pleaded not guilty to the Lerew's trespass to try title.

At the conclusion of the trial, the court, in response to a motion by the Lerews, gave a peremptory instruction in their

favor, and judgment was accordingly rendered in favor of the Lerews, and against all parties; and Peters and wife appeal.

The sole question is, was there any evidence that supported the allegations of appellants' petition to go to the jury.

■ In late spring of 1933 Mrs. Peters took this land in cancellation of notes she held against it after Peters had gone over and inspected it. He advertised this land for sale for about a month in one of the Houston papers in May for $14 an acre, and in September for $13.50 per acre. He was seeking to raise money to help a bank in which his wife was interested. In the fall he saw Barth, who is a real estate agent at Alvin, and who takes applications for Federal farm loans. Peters spoke to Barth about a loan of $10,000 on the land, and they went out to look ·at it, and Barth thought it was worth from $12 to $15 per acre, but it was not in cultivation, and was not eligible for a loan. Peters told Barth that he wanted to sell the land and asked him to send him any prospects; he did not give Barth any right to sell the land, and did not put any price on the land at which he would sell it. Barth understood that if he sent Peters a prospect and Peters sold the land to the prospect that Barth would be paid a commission, but Peters never agreed to pay any commission. Barth told both Sallee and Owen, who were real estate agents at Alvin, about the land, and it was understood that if either of them got a prospect who bought the land, that he would split the commission with Barth. Owen told Loomis about the land being for sale and it was understood that if Loomis should get a prospect who bought the land that Owen would split his part of the commission with Loomis. Loomis told Lerew about the land being for sale and "enlisted" his aid to sell it; if Lerew should produce a prospect who would purchase the land, he was to share in the commission. In short, the most that Peters ever asked of Barth (from whom the rights to a commission of the others was considered as being derived, except as hereinafter indicated) was to see if he (Barth) could get somebody interested in the land, and if so, to submit the price or proposition to Peters and he would consider it. Had Barth produced a prospect and Peters had sold the land to him, the evidence is undoubtedly sufficient to support a judgment in Barth's favor for a commission. But, as stated in T. A. Hill & Son v. Patton & Schwartz, Tex.Civ.App., 160 S.W. 1155, 1157: "It is not true that every ordinary real estate broker with whom land is listed for sale occupies the position of trust and confidence, upon whom rests the duty to obtain the highest price obtainable for his principal's land." (Citing authorities.) "If the duty of the broker is that of mere middleman to bring the parties, together that they may treat with each other and make their own bargain, the position of the broker is in no wise improper or inconsistent." (Citing authorities.) "There is no dispute here that the employment of appellees by Dr. Dew was simply to receive and submit to him cash offers for his property. They were not vested with any discretion of any nature, and their only duty was to advise the land owner of possible opportunities to sell."

In Johnson v. Edrington, Tex.Civ.App., 53 S.W.2d 69, 72, the court said: "An ordinary real estate broker with whom land is listed for sale does not necessarily occupy such a position of trust and confidence as to authorize him to offer price and terms of sale nor impose upon him the duty of actively participating in such negotiations. If the duty of a broker is that of a mere middleman to bring the parties together that they may treat with each other and make their own bargain, his representing both parties is in no wise improper or inconsistent. Allen v. Roach (Tex.Com.App.) 292 S.W. 195, 197, and authorities there cited; T. A. Hill & Son v. Patton & Schwartz (Tex.Civ.App.) 160 S.W. 1155, 1157, par. 5."

■ It is clear to us that Barth, and the real estate agents who were acting under the "listing" given Barth, were but middlemen under the facts of this case, and did not occupy a fiduciary relationship to Peters.

Peters met Lerew on December 4, 1933, at 1311 Dallas, over in Houston, at a building belonging to John. L. Jones, which had been listed with Lerew for sale. Peters understood that Lerew was acting for Mr. Jones, and Peters later phoned to Mr. Jones directly to see if a deal whereby the land here involved was to be traded for the Jones' building, together with $3,500.00 net to Pe-

ters, could be arranged. Peters was under the impression that Loomis was with Lerew at the time he first met Lerew, but it is clear from Loomis' testimony that this was an error, and Loomis did not meet Peters until after the land had been deeded to Lerew. In fact it is undisputed that after this meeting of December 4, 1933, Lerew told Loomis that he had met the man to whom the land here involved belonged. As Peters had never even heard of Lerew up until the meeting of December 4, 1933, at which time he knew that Lerew was acting for Jones, we suppose that appellants base their claim to a right to have the deed set aside on matters which occurred after December 4th. Peters testified as follows:

"Q. Up to the time that you came to town (Houston) on this day, about the middle of December of 1933, that Jones deal was still pending, wasn't it, so far as you were concerned? A. As far as I was concerned. . ."

"Q. Mr. Peters, up until the time that you came down here on that day, about the middle of December, you were still considering the Dallas Avenue deal, weren't you? A. Yes, sir."

Peters testified that it was after he wrote a letter dated December 15, that he and Lerew began talking about Lerew buying the land at a meeting they had at the Texas State Hotel (in Houston). So long as he was dealing with Lerew on the basis that Lerew was representing Jones, we take it that he does not contend that Lerew was occupying a fiduciary relation to him. On December 11, Lerew wrote to Peters asking for an exclusive contract to sell the land here involved; on the next day Peters answered, expressing appreciation that Lerew was trying to put through the Jones trade, but refused to give any exclusive contract, but wrote "I will be glad to consider any offer you may submit." By letter dated December 15, Peters wrote Lerew, "* * * if W. L. Russell takes this matter up with me, I will price the land at $15.00 per acre", and expressed the hope that Lerew would be able to sell the land.

Peters testified:

"I don't know just what prompted Mr. Lerew to write me a letter, pricing it at that figure * * * I don't remember that I ever told him any price; he might

have arrived at that price, in that he knew about what the land stood me, how much money I had in it."

"Q. Did you feel that you were obligated to take the price of $15.00 an acre for it, when you wrote the letter? A. I wouldn't have, at a later date."

"Q. What do you mean by 'at a later date'? A. Later than the letter."

"Q. You mean two days later? A. Well, I wouldn't have felt obligated two days later, or even that day—I wouldn't have necessarily have felt obligated."

It was after the letter dated December 15 from Peters to Lerew, and which we have just been referring to, that Peters saw Lerew at the Texas State Hotel. While the parties don't agree as to who suggested that Lerew buy the land himself, we must adopt Peters' version in view of the instructed verdict against him. According to this version Lerew told Peters that the land was located bad and was low seepage land (and we don't understand that it is claimed this was not true) and that he, Lerew, hadn't been able to sell it, though he had tried, and then proposed buying the land himself. About December 19, Lerew wrote Peters that he was enclosing a form of contract of sale. This contract called for a purchase at $16,500.00 payable in five equal installments, and provides for brokerage fees of 5% to be paid to Owen and Loomis when payments were made, and contains an obligation that Lerew cultivate 200 acres, farming obligations to cease after payment of first note. Peters' attorney, however, required that the transaction be handled as a conveyance, and not as a contract for a deed. And a deed was accordingly executed as of January 3, 1934. It was provided that any bonus received from leasing the land for oil should be applied on the first note.

For the purpose of passing on the court's action in instructing a verdict against appellants we must take as true (Needham v. American National Ins. Co., Tex.Civ.App., 97 S.W.2d 1016; Bragg v. Houston Electric Co., Tex.Civ.App., 264 S.W. 245) the following: In December, Lerew told Loomis that the property was getting too well known among brokers, and that they ought to get the property in such shape that they could control it. The plan was that Lerew was to make a deal with Peters, taking title to the

land in his name, but for the benefit of Owen, Lerew and Loomis. The property was to be kept tied up for a year, during which time each of the three were to try to find a buyer about the $15 per acre sale price, and were to split the profits from any sale three ways; that they believed the land was worth more than $15 per acre. If, however, Lerew was required to pay the notes he was to execute, the other two would lose any right to participate. It is not disputed that Lerew, Owen and Loomis signed an agreement whereby the commission was to be divided so that Owen would get half of it (out of which he was to satisfy any real estate men that had any claims to a commission that were entitled thereto under his dealings) and the other half was to go to Lerew and Loomis. Peters knew nothing of this. And when the notes were paid off half of the 5% commission did go to Owen, and the other half to Loomis (Lerew waiving his right thereto, as Loomis badly needed it). We believe also that there is some evidence that after the sale to Lerew was agreed on, and before it was consummated, that Peters probably saw both Owen and Loomis, and that they urged the sale to Lerew be made, as the best thing for him.

It should be added that there is some evidence that Lerew told Peters that the land had no leasing value. This was before the Hastings' Field discovery well was brought in. The land, however, was in plain view of the derricks of another producing oil field about two and a half miles distant therefrom. And Peters knew that the land had been under lease, and his deed to Lerew provided that if the land was leased the bonus should be applied on the payment of the first note. And Mr. and Mrs. Peters, in so far as the oil companies are concerned, ratified the leases subsequently placed thereon.

It is in evidence that Mr. and Mrs. Peters never learned of the agreement by which Lerew was entitled to share in the commission until in 1938, when a well was brought in on the property; and, of course, never learned, until then, of the alleged agreement of Lerew, Owen and Loomis to tie the property up to get it off the market, and sell it and divide the profits, which Lerew contends, of course, was never made.

■ Even if Owen and Loomis occupied the usual fiduciary relationship of a real estate broker, their agreement to share the commission with the buyer could in no way be injurious to the Peters, nor constitute any ground to set aside the sale, even though it was unknown to the Peters. Chase v. Veal, 83 Tex. 333, 18 S.W. 597; La Beaume v. Smith et al., Tex.Civ.App., 247 S.W. 623; Smith v. Irwin, Tex.Civ.App., 7 S.W. 2d 926. Peters, however, testified that he relied on Barth et al., including Lerew and Loomis and Owen, as to what they told him about the value of the land, etc., It is clear to us that Lerew at no time ever became more than a mere middleman. And he became no more than a mere middleman because Peters declined to accept him in any other capacity. The most that Peters ever agreed to was to consider any prospect that Lerew might send him or proposition that he might submit to him. Having therefore very carefully preserved his own complete freedom from any relationship which imposed any kind of obligations against himself, he likewise left Lerew free from any legal obligations; for if Peters was careful to give Lerew no rights against himself, we fail to see how he could have acquired any rights against Lerew. It was impossible for Lerew to produce a purchaser ready, able and willing to buy the land at terms fixed by Peters because he gave none. It is idle to urge the refusal to give Lerew any terms on which Peters would sell to a purchaser made it the duty of Lerew to get a purchaser who would buy on the best possible terms. The only conclusion that can be drawn from such a refusal is that Peters declined the use of the services or judgment of Lerew as a broker, but would accept a buyer produced by Lerew if the buyer and the proposition were approved by his own judgment. There was nothing in the relationship existing between Lerew and Peters that disabled Lerew from dealing with Peters as any other prospect he might have sent Peters could have dealt.

■ We have concluded, however, that Owen and Loomis ceased to be mere middlemen and became brokers pending the sale to Lerew. For, as we understand the evidence, it is not disputed that about December 19, 1933, it was

agreed that Lerew was an acceptable purchaser upon terms agreed to by Peters, and the liability of Peters to Owen and Loomis for a commission of five per cent, payable out of the notes when paid, was agreed to. The contract of sale was not enforceable because of the statute of frauds. But Peters could not have defeated his liability to Loomis and Owen for a commission by arbitrarily taking refuge behind the statute of frauds, and repudiating the contract of sale. As we understand the evidence, Lerew was accepted as a purchaser of the land by Peters, upon terms acceptable to Peters, upon the 19th or 20th of December, 1933, and the deed was not thereafter executed until January 3, 1934. As we understand the law, if a land owner has rendered it impossible for himself to arbitrarily repudiate a sale of land without liability to an agent for commission earned, then such an agent is necessarily more than a mere middleman. Since such an agent is entitled to the same rights against the vendor as is an ordinary land broker, he must owe his principal the same duties as does an ordinary land broker.

If Loomis and Owen were the agents of Peters, it was their duty to make a full disclosure to their principal. If there was an oral agreement whereby Lerew was to give Loomis and Owen an interest in the land, or rather the profits, if the land were sold within a year—and Loomis and Owen were Peters' agents—it was a fraud not to disclose the same to Peters.

It is true that the written agreement between Lerew, Owen and Loomis excludes the possibility of the existence of any such oral agreement as that testified to by Loomis. But Peters is not a party to such written agreement, and is not asserting any rights thereunder. So it was not error for the court to admit evidence of such oral agreement in favor of Peters, but exclude it as against the claim of Loomis and those claiming under Owen. The rule that parol evidence shall not be received to alter or contradict a written instrument applies to controversies between parties to it, and those claiming under them, but not to strangers. Hughes v. Sandal, 25 Tex. 162. And since the Peters testified they knew nothing of any additional compensation which Loomis and Owen were to receive until a few days before suit was brought in 1938, their acceptance of payment of the notes before they heard of such additional compensation could not constitute a ratification.

As there was some evidence that Loomis and Owen had agreed to accept additional compensation from Lerew which it was a fraud on their part against their principal not to disclose, it was error peremptorily to instruct a verdict in favor of appellees. The cause is reversed and remanded for a new trial.

Reversed and remanded.