Opinion issued October 13, 2005





   

                                                                     









In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-99-00658-CV
____________

BAROID EQUIPMENT, INC. F/K/A SHAFFER, INC. AND VARCO
SHAFFER COMPANY, Appellants

V.

ODECO DRILLING, INC.; ODECO ENTERPRISES, INC.; DIAMOND-M
ODECO, LTD.; AND REXNORD CORPORATION, Appellees

***

ODECO DRILLING, INC.; ODECO ENTERPRISES, INC.; AND
DIAMOND-M ODECO, LTD., Appellants

V.

BAROID EQUIPMENT, INC. F/K/A SHAFFER, INC. AND VARCO
SHAFFER COMPANY, Appellees

***

REXNORD CORPORATION, Appellant

V.

BAROID EQUIPMENT, INC. F/K/A SHAFFER, INC. AND VARCO
SHAFFER COMPANY, Appellees



 
On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 92-46895




O P I N I O N
          This is an appeal from a bench trial, after which the trial court awarded contract
damages and attorney’s fees to Odeco Drilling, Inc., Odeco Enterprises, Inc., and
Diamond-M Odeco, Ltd. (collectively, “Odeco”) against Baroid Equipment, Inc., f/n/a
Schaffer, Inc., and Varco Shaffer Company (collectively, “Baroid”). The trial court
also awarded Baroid damages and attorney’s fees on its indemnity cross-claim against 
a co-defendant, Rexnord Corporation (“Rexnord”). The primary issue presented by
the appeal is whether Odeco, the operator of a semi-submersible drilling rig and
purchasing agent for the rig builder, entered into an oral contract with Baroid, an
equipment supplier to the rig, that created warranties running to Odeco, which were
greater than, and in addition to, the warranties Baroid made to the rig builder, who
was the actual purchaser of the equipment.
 
BACKGROUND
          Odeco owns and operates semi-submersible drilling rigs. This case involves
a component of those rigs called a chain riser tensioner system (“CRTS”). A riser is
an enclosed system between the ocean floor and the bottom of the rig that houses the
drill pipe and related accessories so that they are insulated from the water. The riser
is a series of 50-foot pipes that are attached to the blowout preventer, which sits on
the ocean floor. Because rigs are subject to the heave of the ocean, it is necessary to
keep the riser pipe taut by maintaining tension on it. The tension is created by means
of a riser tensioner system, which allows the rig to move up and down while
maintaining constant tension on the riser.
          Early riser tensioning systems employed wire rope. However, around 1980, the
NL Shaffer division of NL Industries, Inc. (hereinafter, “Baroid”)


, began marketing
a tensioner system that used a chain, rather than a wire rope (CRTS). 
A. Odeco, Baroid, and the OCEAN ODYSSEY
          Odeco began to discuss using a CRTS in 1979 or 1980, in connection with one
of its semi-submersible rigs, the OCEAN ODYSSEY.


 Odeco had been doing
business with Baroid and its predecessor companies, since 1954. Odeco viewed
chains as an alternative to wire rope for its tensioners because of the increased depth
rating required for ocean-going rigs and because wire rope was more difficult to store
on the rigs. Odeco, with Baroid’s assistance, prepared performance specifications for
the OCEAN ODYSSEY’s chain riser tensioners and made calculations concerning
the size and number of chain riser tensioners needed. Although Odeco knew that a
CRTS had never been manufactured before, it was satisfied with Baroid because
Baroid had invented the concept of ocean heave compensation equipment.
          Tom Bishop, a Baroid production planner, and later Baroid’s vice-president of
sales, testified that, in 1980-81, he was assigned to the Odeco account. Odeco was
the largest account in Baroid’s New Orleans office and a long-time Baroid customer. 
Both Bishop and his supervisor at the time, Vinny Barone, talked to Odeco about the
advantages of chain riser tensioners. Those advantages included a five-year life
expectancy, an ability to bend the chains over a smaller radius, and an ability to avoid
the high stresses and prevent the slippage caused by wire rope. Additionally, chains
weighed less than wire rope and were easier to inspect and maintain.
          In 1981, Stanley Baleson, Baroid’s district manager in New Orleans, arranged
for Baroid’s engineers to put on a major presentation about CRTSs for Odeco. At the
presentation, Baroid touted the advantages of a CRTS, as set forth in Baroid’s
catalog, which had been distributed to long-standing Baroid customers such as
Odeco. 
          In February 1981, Baroid quoted Odeco a price for a CRTS to be placed on the
OCEAN ODYSSEY. The OCEAN ODYSSEY was completed in 1983 and chartered
to an oil company for drilling in the Gulf of Alaska. Because the CRTS was a new
invention, there was no service history for chain riser tensioners before the OCEAN
ODYSSEY went into service. The chains on the OCEAN ODYSSEY’s tensioners
were manufactured by Whitney, a division of Dresser Industries. The Whitney chains
failed shortly after the OCEAN ODYSSEY went into operation.
B. The OCEAN ALLIANCE
          While the OCEAN ODYSSEY was under construction, Odeco became
involved in the building of a second semi-submersible rig, the OCEAN ALLIANCE. 
Around 1980, British National Oil Company (hereinafter, “Britoil”) and Ben Line
Steamers, Ltd. (hereinafter, “Ben Line”) began discussing the construction of a semi-submersible drilling rig. The rig was to be built according to a contract with Britoil. 
At the end of the term, the parties contemplated that Britoil and a contractor would
each own a one-half interest in the rig. Britoil and Ben Line agreed that Odeco would
serve as the contractor through Ben Odeco Limited, a company jointly owned by Ben
Line and Odeco.
          1. Ownership, Leasing, and Operation of the OCEAN ALLIANCE
          The construction and financing of the OCEAN ALLIANCE involved creating
a new company, St. Vincent Drilling Limited (hereinafter, “St. Vincent”), the shares
of which were owned 50% by Britoil and 50% by Ben Odeco. The rig was actually
ordered and owned by Lloyds Leasing Limited (hereinafter, “Lloyds Leasing”) and
leased by St. Vincent. The contract between Lloyds Leasing and St. Vincent
provided that, at the end of the lease term, St. Vincent could continue to lease the rig
for a nominal amount or instruct Lloyds Leasing to sell the rig, with St. Vincent
receiving the majority of the proceeds.
          In December 1981, Britoil, Ben Odeco Limited, and St. Vincent entered into
a joint venture agreement to build and operate the OCEAN ALLIANCE. Lloyds
Leasing chartered the OCEAN ALLIANCE to St. Vincent. In a three-party
agreement, St. Vincent subcharted the OCEAN ALLIANCE to Britoil. Britoil and
Ben Odeco Limited entered into an operating agreement under which Ben Odeco
Limited would operate the OCEAN ALLIANCE. Ben Odeco Limited’s two
shareholders, Odeco, Inc. and Ben Line, guaranteed Ben Odeco Limited’s
performance to Britoil. 
 
 
          2. Construction of the OCEAN ALLIANCE
          A number of shipyards were considered to construct the rig. The joint venture
eventually selected Scott Lithgow Limited (hereinafter, “Scott Lithgow”) of Port
Glasgow, Scotland, because Ben Odeco Limited


 had knowledge of the shipyard and
its capabilities. 
          On December 30, 1981, Lloyds Leasing, as owner of the rig, contracted with
Scott Lithgow, as rig builder, to construct, build, launch, test, and complete “one
dynamically positioned column-stabilized self-propelled drilling unit” for a price of
88.6 million pounds sterling. Also on December 30, 1981, Scott Lithgow and Odeco
signed a letter agreement, which appointed Odeco as the agent for Scott Lithgow to
purchase Owner’s Specified Equipment (OSE) for the rig, the OCEAN ALLIANCE.
          On the same day, several other agreements and charterparties arose relating to
the OCEAN ALLIANCE. Lloyds Leasing, Britoil, and St. Vincent entered into a
supervision agreement under which Lloyds Leasing appointed St. Vincent to act as
its representative under the shipbuilding agreement. St. Vincent, Odeco, and Britoil
entered into sub-supervision agreement, under which St. Vincent delegated to Odeco
the rights, powers, and duties as Lloyds Leasing’s representative during the
construction of the OCEAN ALLIANCE. 
          Decisions about the kind of equipment to install on the OCEAN ALLIANCE
were to be made jointly between Odeco and Britoil. If a disagreement arose, Britoil
would make the decision because it was to pay for both the rig and its equipment. 
Britoil had substantial input into all equipment decisions. In general, Odeco made
proposals to Britoil about the equipment and then, if necessary, Odeco and Britoil
would discuss the matter and reach an agreement about what equipment to order.
          Odeco, as the shipbuilder’s purchasing agent, acted to procure OSE, even
though Scott Lithgow, the shipbuilder, purchased and paid for it. Odeco obtained
bids, specified equipment, and did the normal things an owner does, independent of
a shipyard, in buying the necessary equipment. Scott Lithgow paid the invoices upon
Odeco’s approval.
          In November 1981, Odeco personnel in Scotland sent a telex to Odeco
personnel in New Orleans proposing the following ordering procedure with respect
to the OCEAN ALLIANCE and stating the following:
          1. Odeco would obtain Britoil or Ben Line consensus as required;
          2. Odeco would issue purchase requisitions for internal approval authority; and
3. Purchase orders were to be typed by Odeco onto Scott Lithgow purchase 


          order forms.

          3. Purchase of the CRTS for the OCEAN ALLIANCE

          The chain riser tensioners for the OCEAN ALLIANCE were OSE. Gary
Egbert, a Baroid engineer who worked on CRTS design, testified that Western Gear,
a competitor of Baroid, had also been asked to quote a price on a CRTS for the
OCEAN ALLIANCE.
          On September 29, 1981, Odeco sent telexes to Brown Brothers, Ltd., Western
Gear, Vetco, and Baroid requesting bids on motion compensation equipment for the
rig. According to the requests, the percentage of U.K. content on the equipment had
to be stated, and, if a purchase order issued, the purchase order would be issued to an
established United Kingdon company. Brown Brothers submitted a quote on October
16, 1981. In contrast to the telexes, which indicated that a bidding process would be
followed, Odeco engineer, Terry Petty, testified that the decision to purchase
Baroid’s CRTS was made even before Lloyds Leasing executed the Scott Lithgow
shipbuilding contract.
          On August 10, 1981, Tom Bishop, while a Baroid sales representative, wrote
to Ralph Loomis, of Odeco, submitting Baroid’s bid on the OCEAN ALLIANCE
project. The letter stated that the proposal was based upon, and subject to,
“[Baroid’s] standard terms and conditions of sales.” According to the summary sheet,
the quote included a drill string compensator, CRTS, guideline tensioner system, taut
line tensioner system, 120 ton mooring system, flotation dolly system, and spare parts
for such. The total price was $5,555,338.50.
          On September 15, 1981, Baleson, another Baroid employee, wrote Loomis
submitting “Rev. A” to Baroid’s quote on the OCEAN ALLIANCE. Again, the letter
stated that the proposal was based upon, and subject to, “[Baroid’s] standard terms
and conditions of sales.” The summary sheet section of the quote indicates the same
type of equipment, but the total price had increased to $5,608,304.00.
          On October 30, 1981, Baleson wrote an internal memorandum stating that
Baroid’s prices for the “Odeco/BNOC D.P. Semi-Submersible Sub-Sea and Motion
Compensation Packages” were considerably higher than that of the competition for
the equipment quoted. He noted that, while Odeco was partial to Baroid, Britoil was
not, because Britoil personnel had little experience with Baroid equipment. He
recommended reducing the margins on Baroid’s prices, reducing the percentage of
escalation, and offering a discount if the entire package was purchased. On
December 9, 1981, Baleson wrote a letter to Odeco in New Orleans, offering Odeco
a “time payment plan option” relating to the Baroid equipment quotations.
          Baleson sent another letter to Odeco on January 13, 1982, responding to
Odeco’s request for a cost analysis on the chain tensioners. Among other things, the
letter stated:
(1)     It was not farfetched to say that [Baroid] had more systems           operating in the field than all of its competitors combined, and           that [Baroid] had applied its experience to design a far superior           chain tensioning system that would far offset the initial expense.
 
(2)     Conservatively, the 160K chain tensioners would save the Ocean           Alliance well over $2,000,000 in a five-year period.
 
(3)     If the Ocean Alliance were outfitted with wire tensioners, and if           the rig later required additional tension, there would be enormous           complications that would not exist with chain tensioners.
 
(4)     Baroid concluded that the 160K chain tensioner system initially           cost more, but that it was not more expensive.
 
          On January 25, 1982, Petty, as purchasing agent for Scott Lithgow, sent
Baleson a telex stating that Baroid had been selected as the vendor to provide the
motion compensator-drill string compensator and guideline tensioner system for the
OCEAN ALLIANCE. The telex also stated that a formal written purchase order
would be issued on Scott Lithgow’s paper to Baroid’s United Kingdom-registered
company and that, “in addition to standard terms,” parts of Baroid’s “Rev. A”
quotation and Baleson’s December 9, 1991 letter to Odeco would become part of the
formal written purchase order.
          On March 11, 1982, a 38-page purchase order was issued on Scott Lithgow
letterhead to NL Shaffer Services of London, England—Baroid’s United Kingdom-
registered company—for a 160K CRTS to be placed on the OCEAN ALLIANCE. 
Attached to the Scott Lithgow purchase order, and forming a part of it, were the
September 15, 1981 letter from Baleson to Odeco, the quote and its revision, the two
letters dated December 9, 1981 and January 13, 1982 from Baroid to Odeco, and a
two-page document entitled “Chain Tensioners” setting forth various advantages of
chain riser tensioners. The Scott Lithgow purchase order provided for eight CRTSs
at a price of $2,896,034. The purchase order was signed by Petty of Odeco. Notes
on the first page of the purchase order indicated that inquiries, correspondence, and
data submissions were to be addressed to Odeco in New Orleans, “Attention: Petty,”
and that invoices were to be addressed to Leslie Coventry of Scott Lithgow in Port
Glasgow. The purchase order also stated the following:
Contractor [NL Shaffer Services of London] recognizes that the
Company [Scott Lithgow] has entered into this contract for the benefit
of Lloyds Leasing Limited but that by virtue of the charterparty by way
of demise The British National Oil Corporation will be the end user of
the Vessel for which goods, materials, works or services are ordered
hereunder and the Contractor agrees that this Contract including the
guarantees and warranties (express or implied) contained in this
Contract shall enure for the benefit of, and shall be freely assignable to
Lloyds Leasing Limited and The British National Oil Corporation. 
 
          On June 18, 1982, Baroid, from its Houston offices, sent a letter to Odeco, in
New Orleans, listing its proposed modifications to the “British Shipbuilder’s
Conditions of Purchase” that apparently accompanied the Scott Lithgow purchase
order. Among other things, Baroid wanted to replace the Guarantee and Defects
Liability clause in the British Shipbuilders Conditions with a clause that closely
followed its own standard terms and conditions.
          There was no immediate response from Odeco to the June 18 letter. On July
12, 1982, Baroid sent another letter to Odeco stating that, because no formal response
had been received, Baroid assumed that the modified terms were acceptable to Scott
Lithgow and Odeco. On July 16, 1982, Petty of Odeco sent a telex to Baroid stating
that Baroid’s standard terms and conditions, which were included in its quote, took
precedence over the British Shipbuilders Conditions; therefore, it would not be
necessary to modify the British Shipbuilders Conditions. Petty testified that Baroid’s
terms and conditions applied to the purchase order.
          The warranty in Baroid’s standard terms and conditions read as follows:
4. Warranty, Remedy, Disclaimer
 
[Baroid] warrants for a period of one year only from the date of
shipment that the equipment of its own manufacture to be delivered
hereunder shall be free of defects in materials and workmanship under
normal use and service, and provided the equipment is used and
maintained in accordance with instructions supplied by [Baroid]. THIS
IS [BAROID’s] SOLE AND EXCLUSIVE WARRANTY. If such a
defect “in [Baroid] equipment” appears within one year from the date of
shipment and Purchaser has given written notice of such defect within
thirty days from the discovery thereof, [Baroid] will repair the part, or
at its option replace the part by shipping a similar part FOB shipping
point or at its option refund an equitable portion of the purchase price.
[Baroid] may require the return to a designated [Baroid] location of the
defective part transportation prepaid to establish the claim. No
allowance will be made for repairs without [Baroid’s] written consent
or approval. Said warranty applies only to equipment manufactured by
[Shaffer]. Warranties on equipment manufactured by others, if any, are
assigned to the Purchaser by [Baroid] (without recourse) at time of
delivery. Any descriptions of the equipment, drawings, specifications,
and any samples, models, bulletins, or similar material used in
connection with this sale are for the sole purpose of identifying the
equipment and are not to be construed as an express warranty that the
equipment will conform to such description. . . . EXCEPT AS ABOVE
SET FORTH, THERE SHALL BE NO OTHER WARRANTY OF
FITNESS OR MERCHANTABILITY OR OTHER WARRANTY OR
LIABILITY WHETHER EXPRESSED ORALLY OR IN WRITING OR
IMPLIED IN FACT OR IMPOSED BY STATUTE. The purchaser’s
sole and exclusive remedy, whether based upon warranty, contract or
tort, including negligence, will be to proceed under this warranty. All
liability of [Baroid] shall terminate one year from the date of shipment
of the equipment.
 
5. Limitation of Liability
 
[Baroid] shall in no event be liable for special indirect, incidental or
consequential damages . . . . [Baroid’s] liability on any claim of any kind
arising out of this sales contract shall in no case exceed the price paid by
Purchaser for the equipment. [Baroid] disclaims all liability, whether in
contract, tort, warranty, or otherwise, to any party other than Purchaser.
 
          Terry Petty of Odeco testified that, despite the warranty language in the
purchase order, he believed, based on 40 years’ experience between Baroid and
Odeco, that Odeco would “stand behind their products” and find a solution to any
equipment failure.
          Baroid also contracted with Hyundai Heavy Industries, Co. Ltd. (Hereinafter
“Hyundai”), another shipbuilder for whom Odeco acted as agent, to provide CRTSs
for two other drilling rigs, the OCEAN VALIANT and the OCEAN AMERICA.
          4. Problems with the CRTS
          The OCEAN ODYSSEY, which went into service in 1983, experienced
problems with the Whitney chains on its CRTS. After hearing of the problems with
the Whitney chains, Rexnord Corporation approached Odeco in 1984 and indicated
that it could design a chain that would work. The Rexnord chains were incorporated
into Baroid’s CRTS on the OCEAN ALLIANCE in December 1985.
          The OCEAN ALLIANCE went into service in December 1988. The Rexnord
chain failed on three separate occasions in 1990.
C. The Litigation
          In 1992, Odeco filed suit against Baroid and Rexnord. Odeco asserted claims
for violation of the DTPA,


 breach of warranty, fraud, negligence, products liability,
and breach of contract, alleging that it had incurred chain replacement costs, damage
to other rig property, increased servicing and lubricating costs, and lost drilling time
for which the defendants were responsible as the designers, engineers, manufacturers,
distributors, or lubricators of the “160K Chain Riser Tensioner.” In separate answers,
Baroid and Rexnord denied the allegations and asserted affirmative defenses. 
Additionally, Baroid filed (1) a counterclaim against Odeco, alleging that Odeco’s
DTPA suit was groundless and, therefore, Baroid was entitled to reasonable
attorney’s fees under the DTPA, and (2) a separate cross-claim against Rexnord,
asserting that, if Odeco was damaged as alleged, then Rexnord was liable to Baroid. 
Rexnord also filed a cross-claim against Baroid, maintaining that, if Odeco was
damaged as alleged, then Baroid was liable to Rexnord.
          1. Special Judge Proceedings
          In 1995, almost three years after Odeco filed suit, the parties filed a joint
motion to refer all issues “presently before this [trial] court” to a special judge in
accordance with chapter 151 of the Texas Civil Practice and Remedies Code. See
generally Tex. Civ. Prac. & Rem. Code Ann. §§ 151.001-.013 (Vernon 1997) (trial
by special judge). The motion was accompanied by a Rule 11


 agreement that named
the Honorable Daniel M. Downey as the special judge, froze the pleadings as they
were on February 15, 1995, and set February 26, 1996 as the trial date before Judge
Downey.


 The trial court granted the motion and signed an order of referral on March
3, 1995. 
          In 1996, Odeco and Rexnord reached a settlement and jointly moved the
special judge to dismiss Odeco’s claims against Rexnord with prejudice. In the
settlement agreement, Rexnord agreed to pay Odeco $1 million. In return, Odeco
agreed to indemnify Rexnord on any claims asserted against it by Baroid. The special
judge signed an order doing so on August 16, 1996. There are no issues on appeal
concerning the dismissal, but Baroid contends that it should receive a credit for the
settlement amount to the extent that it is found liable and as an offset to the attorney’s
fees it has incurred.
          On November 7, 1996, the special judge signed a take-nothing partial summary
judgment in favor of Baroid. The take-nothing partial summary judgment disposed
of Odeco’s claims against Baroid (1) “sounding in tort” (i.e. negligence, strict
liability, and fraud) and (2) for breach of implied warranties. Odeco makes no
complaint on appeal about the dismissal of these claims.
          Odeco’s DTPA claims against Baroid were either dismissed or abandoned, and
Odeco does not complain on appeal about their disposition; however, Baroid
maintains on appeal, as it did before the special judge, that it is entitled to attorney’s
fees under the DTPA from Odeco because Odeco’s DTPA claims were groundless or
brought in bad faith. See Tex. Bus. & Com. Code Ann. § 17.50(c) (Vernon 2002).
          Thus, at trial, Odeco’s only remaining claims were those against Baroid for
breach of contract and breach of express warranty. Also remaining were Baroid’s
DTPA counterclaims against Odeco, Baroid’s cross-claims against Rexnord, and
Rexnord’s cross-claims against Baroid. 
          2. The Trial
          The bench trial before the special judge began on October 14, 1997. After
Odeco rested, Baroid moved for judgment, which the special judge granted in part by
ruling that Odeco could not recover damages for breach of warranty or breach of
contract with respect to the OCEAN VALIANT and the OCEAN AMERICA, the two
vessels that did not experience CRTS failures.
          Baroid rested on February 12, 1998. On that date, Rexnord moved for
judgment against Baroid on its cross-claims for contribution and indemnity. 
Ultimately, the special judge signed “the second amended judgment,” his final
“verdict,”


 on March 5, 1999, and his final findings of facts and conclusions of law,
the “fifth amended findings of fact and conclusions of law,” on June 2, 1999. In the
final verdict, the special judge awarded Odeco $1,909,370.43 in actual damages
against Baroid, plus interest and attorney’s fees, such amount representing the costs
of retrofitting the OCEAN ALLIANCE from a chain riser tensioning system to a wire
riser tensioning system. The final verdict also awarded Baroid $1,909,370.92 in
actual damages, plus interest and attorney’s fees, against Rexnord, such amount
representing the amount Baroid was ordered to pay Odeco.
          3. This Appeal
          Rexnord and Baroid filed notices of appeal on June 2, 1999. Odeco filed a
notice of appeal on June 14, 1999. On November 20, 2001, this Court abated the
appeal, holding that the verdict signed by the special judge was not a “final judgment”
because it had never been memorialized as such by the sitting judge of the trial court. 
See Newton & Swenson, Adjudication by Privately Compensated Judges in Texas,
36 Baylor L. Rev. at 839 n.204.
          Thereafter, the trial court signed a final judgment on February 26, 2002,
adopting the special judge’s verdict for all purposes and entering the terms of that
verdict as the terms of the final judgment. The 2002 final judgment made the
premature notices of appeal, filed by the parties in 1999, timely. See Tex. R. App. P.
27.1. 
THE BAROID APPEAL
          In his findings of fact and conclusions of law, the special judge found that an
oral contract existed between Odeco and Baroid, wherein Odeco “agreed to cause its
rig builders to use [Baroid’s] CRTS on rigs ultimately to be owned or controlled by
Odeco,” and Baroid, in return, agreed to “stand behind its product.”



          In four issues on appeal, Baroid contends that the alleged oral contract is not
enforceable because (1) the parol evidence rule bars consideration of earlier, oral
warranties that are inconsistent with the written warranty found in the Scott Lithgow
purchase order; (2) Odeco, as purchasing agent for Scott Lithgow, could not obtain
warranties on the Baroid equipment that were greater than, and in addition to, the
warranties made to Scott Lithgow, the actual purchaser of the equipment; (3) there
is legally and factually insufficient evidence to show that Baroid and Odeco entered
into an oral contract; and (4) there is legally insufficient evidence to show that Odeco
suffered damages as a result of the breach of the alleged oral contract. Because we
find these issues dispositive of much of Baroid’s appeal, we address them first.
A. Parol Evidence
          In issue three, Baroid contends that Odeco’s breach of contract and breach of
warranty claims are barred by the parol evidence rule. Specifically, Baroid contends
that any earlier warranties it may have made regarding the CRTS were merged into
the final, written contract—the Scott Lithgow purchase order—and cannot be used
to contradict the terms of that written contract.
          The parol evidence rule provides that the terms of a written contract cannot be
contradicted by evidence of an earlier, inconsistent agreement. Lewis v. Adams, 979
S.W.2d 831, 836 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Under the parol
evidence rule, if the parties have integrated their agreement into a single written
memorial, all prior negotiations and agreements with regard to the same subject
matter are excluded from consideration, whether they were oral or written. Smith v.
Smith, 794 S.W.3d 823, 827 (Tex. App.—Dallas 1990, no pet.) Additionally, a
written instrument presumes that all prior agreements relating to the transaction have
been merged into it and will be enforced as written and cannot be added to, varied,
or contradicted by parol testimony. Id. The rule is particularly applicable when the
written contract contains a recital that it contains the entire agreement between the
parties or a similarly-worded merger provision. Weinacht v. Phillips Coal Co., 673
S.W.2d 677, 679 (Tex. App.—Dallas 1984, no writ).
          The parol evidence rule is not a mere rule of evidence, but a rule of substantive
contract law. Piper, Stiles & Ladd v. Fid. and Deposit Co., 435, S.W.2d 934, 940
(Tex. Civ. App.—Houston [1st Dist.] 1968, writ ref’d n.r.e.). As a question of law,
the standard of review is de novo. City of Pasadena v. Gennedy, 125 S.W3d 687, 691
(Tex. App.—Houston [1st Dist.] 2003, pet. denied). Evidence violating the parol
evidence rule has no legal effect and “merely constitutes proof of facts that are
immaterial and inoperative.” Piper, Stiles & Ladd, 435 S.W.2d at 940.
          The only written contract in this case—the Scott Lithgow purchase
order—contains the following merger provision in its terms and conditions:
The sales contract incorporating these terms and conditions becomes a
binding contract on the terms set forth herein when it is accepted by
acknowledgment or commencement of performance. Said Contract can
be so accepted only on the exact terms herein set forth (including the
modes of acceptance specified in the immediately preceding sentence)
and no terms which are in any manner whatsoever additional to or
different from those herein set forth shall become a part of or in any
way alter the aforementioned contract except with the express written
consent of [Baroid]. 

[Emphasis added.]

          Therefore, the Court must decide two issues relating to the merger clause: (1)
whether the parol evidence rule applies against Odeco, a nonparty to the written
contract, and (2) whether the terms of the oral agreement conflict or add to the terms
of the written contract.
          1. Does the parol evidence rule apply against a nonparty to the contract?
          The general rule is that, before one contract is merged into another, the last
contract must be between the same parties as the first, must embrace the same subject
matter, and must have been so intended by the parties. Fish v. Tandy Corp., 948
S.W.2d 886, 898-99 (Tex. App.—Fort Worth 1997, writ denied). The rule that parol
evidence shall not be received to alter or contradict a written instrument applies to
controversies between parties to it, and those claiming under them, but not to
strangers. Peters v. Lerew, 139 S.W.2d 321, 327 (Tex. Civ. App.—Galveston 1940,
writ dism’d judgm’t cor.).
          However, in some instances, the third party has been so involved with the
creation of the written contract, or is claiming rights under the contract such that he
is bound to abide by its terms, i.e., he is no longer a stranger to the contract. See
Brannon v. Gulf States Energy Corp., 562 S.W. 2d 219, 223-24 (Tex. 1977); Ragland
v. Curtis Mathes Sales Co., 446 S.W.2d 577, 578 (Tex. Civ. App.—Waco 1969, no
writ).
          In Kingsbery v. Phillips Petroleum Co., the court summarized the authorities
for applying the parol evidence rule to third parties in such circumstances:
“It is commonly said that the Parol[ ] Evidence rule, in the present
aspect, is binding upon only those persons who are parties to the
document. This form of statement suffices in most instances to reach
correct results; but it is not sound on principle.
 
 * * * 
 
“The truth seems to be, then, that the rule will still apply to exclude
extrinsic utterances, even as against other parties, provided it is sought
to use those utterances for the very purpose for which the writing has
superseded them as the legal act.” IX Wigmore on Evidence, 3d Ed.,
Sec. 2446, pp. 149, 150. 
 
“The question has been raised whether the ‘parol[ ] evidence rule’ is
applicable in favor of or against a third party who has not been a party
to the written integration. The answer is definitely in the affirmative if
the rule is correctly stated and understood. If two parties have by a
complete written integration discharged and nullified antecedent
negotiations between them, they are so discharged and nullified without
regard to the identity of the person who may be asserting or denying the
fact. If A has a claim for damages against B, and this claim is honestly
discharged by a release or an accord and satisfaction, the operation of
this discharge is not affected by the fact that it is C who afterwards
asserts or denies it.” Arthur L. Corbin, The Parol[ ] Evidence Rule, 53
Yale Law Journal 603, 661-662. 
 
“One class of cases consists of those where, in a suit involving
non-parties to the instrument, some oral agreement or understanding
between the parties to the instrument variant from its terms is sought to
be shown. If the purpose is to show intent where that is an issue, or if
the instrument is not within the rule because a mere memorandum and
not an embodiment of the transaction, there can be no objection, but
under similar circumstances the evidence would be admissible if the suit
were between the original parties. But if the purpose be to show that the
immediate legal effect of the transaction (such as a contract, or transfer
of land or chattels) was different from that expressed in the embodying
instrument, (as an agreement that a deed should convey different land
from that described) then the Parol[ ] Evidence Rule would apply, even
though the evidence is being offered by or against a person not a party
to the instrument.” 2 McCormick and Ray, Texas Law of Evidence, 2d
ed., Sec. 1621, pp. 474-476. 
 
Kingsbery v. Phillips Petroleum Co., 315 S.W.2d 561, 571-72 (Tex. Civ.
App.—Austin 1958, writ ref’d n.r.e.).
          In Kingsbery, the plaintiff, Kingsbery, and the defendant, Phillips Petroleum,
had agreed that Kingsbery would organize a corporation with which Phillips would
sign a “jobber contract” to provide a retail outlet for Phillips’ products. Id. at 563. 
Accordingly, Kingsbery incorporated Reed-Phillips Oil Company, which in turn,
entered into a written contract with Phillips for a period of one year, renewable on a
year-to-year basis. Id. at 564. After one year, Phillips terminated the contract and
Kingsbery sued, contending that he had a separate oral contract with Phillips, wherein
Phillips waived its right to cancel the contract for a period of 20 years. Id. at 571. 
The court held that, even though Kingsbery was not a party to the written contract
between Reed-Phillips and Phillips, he was nonetheless bound by its terms because
(1) Kingsbery had agreed to organize a corporation with which Phillips would sign
a jobber agency instrument; (2) the corporation was formed and entered into a written
contract with Phillips in the presence of Kingsbery, who was its principal stockholder
and who had represented the corporation in the negotiations with Phillips; and (3)
Kingsbery was relying on the formation of that contract, at least in part, to support his
cause of action. Id. at 572.
          In this case, Odeco represented Scott Lithgow in its purchase negotiations with
Baroid. As part of its negotiations, Odeco admitted that Baroid’s standard terms and
conditions applied to the purchase of the CRTS.


 Baroid’s standard terms and
conditions provided, among other things, a one-year warranty from the date of
shipment on equipment manufactured by Baroid. The terms and conditions included
the merger language referenced earlier and “disclaim[ed] all liability, whether in
contract, tort, warranty, or otherwise, to any party other than [Scott Lithgow].”
          Like the plaintiff in Kingsbery, Odeco negotiated the terms of the written
contract as the agent for another company.


 Also, like the plaintiff in Kingsbery,
Odeco’s claim rests on the existence of the written contract at issue in the case. That
is, but for the sale of the CRTS from Baroid to Scott Lithgow, there would be no basis
for Odeco to claim an oral contract to warranty the CRTS to Odeco. Therefore, like
the plaintiff in Kingsbery, we hold that Odeco is not a “stranger” to the written
contract between Baroid and Scott Lithgow and cannot offer parol evidence of an oral
agreement that conflicts with or adds to the terms of the written contract that it
negotiated on behalf of Scott Lithgow.



          2. Does the alleged oral contract conflict with or add to the written contract?
          The parol evidence rule does not preclude enforcement of prior or
contemporaneous oral agreements that are collateral to an integrated agreement and
are not inconsistent with, and do not vary or contradict, the express or implied terms
or obligations thereof. Hubacek v. Ennis State Bank, 317 S.W.2d 30-31 (Tex. 1958). 
An oral agreement is not superseded or invalidated by a subsequent or
contemporaneous integration, not a written agreement by a subsequent
integration relating to the same subject-matter, if the agreement is not
inconsistent with the integrated contract, and (a) is made for separate
consideration, or (b) is such an agreement as might naturally be made as
a separate agreement by parties situated as were the parties to the written
contract.

Williams P. Terrell, Inc. v. Miller, 697 S.W.2d 454, 457-58 (Tex. App.—Beaumont 

1985, no writ).

          Odeco argues that the oral contract found by the special judge does not conflict
with or add to the terms of the written purchase order. We disagree.
          The special judge found that Baroid promised Odeco “that (1) the chains on the
riser tensioner system would last for at least five years; (2) over that five-year period,
Odeco would save money because of reduced maintenance expenses; and (3) the
system would operate at 160,000 lbs continuously.” The special judge also found that
Baroid promised Odeco that it would “stand behind its product” and that “[the
benefits and advantages represented to Odeco in [Baroid’s] correspondence,
catalogues, presentations, operating manuals and other materials forms the ‘basis of
the bargain’ between Odeco and [Baroid].”
          In contrast, the written contract provides a limited warranty against defects in
material and workmanship for one year from the date of shipment. The written
contract also states that it only warrants equipment manufactured by Baroid. The
chains were not manufactured by Baroid, but by Rexnord. The written contract also
“disclaims all liability, whether in contract, tort, warranty, or otherwise, to any party
other than [Scott Lithgow].” Finally, the written contract expressly states that none
of its sales materials create warranties.



          Because we have held that Odeco is bound by the terms of the written contract
and that the alleged oral contract actually conflicts with the written contract, we
sustain Baroid’s third issue on appeal.
 
B. Sufficiency of the Evidence
          In issues six and nine, Baroid contends that there is legally and factually
insufficient evidence to support an award of damages on Odeco’s breach of contract
claim. In an appeal from a bench trial, findings of fact have the same weight as a
jury’s verdict upon special issues. Lee v. Lee, 981 S.W.2d 903, 905 (Tex.
App.—Houston [1st Dist.] 1998, pet. denied). Such findings, if challenged, are
reviewable for legal and factual sufficiency of the evidence by the same standards
applicable in reviewing the sufficiency of the evidence supporting a jury’s findings. 
Gennedy, 125 S.W.3d at 691; Lee, 981 S.W.2d at 905–06. Thus, if the complaining
party challenges the legal sufficiency of the evidence underlying an adverse finding
on which the party did not have the burden of proof, then the party must demonstrate
on appeal that there is no evidence to support the finding. Gennedy, 125 S.W.3d at
691. In such a review, we consider all the evidence in the light most favorable to the
prevailing party, indulging every reasonable inference in that party’s favor, and
disregard all evidence and inferences to the contrary. Id. at 692. If more than a
scintilla of evidence supports the finding, the no-evidence challenge fails. Id. 
          In our review of factual sufficiency of the evidence, we must consider and
weigh all of the evidence. Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). 
We will set aside a verdict only if the evidence is so weak or if the finding is so
against the great weight and preponderance of the evidence that it is clearly wrong
and unjust. Id.
          In issue nine, Baroid contends that there is no evidence to support the existence
or terms of the oral contract found by the special judge. In issue six, Baroid contends
that there is no evidence that Odeco suffered damages, separate and apart from the
purchaser, as a result of the problems with the CRTS.
          1. Existence or Terms of the Contract
          The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a
meeting of the minds, (4) each party’s consent to the terms, and, in the case of a
written contract, (5) execution and delivery of the contract with the intent that it be
mutual and binding. Prime Prods., Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631, 636
(Tex. App.—Houston [1st Dist.] 2002, pet. denied); Copeland v. Alsobrook, 3 S.W.3d
598, 604 (Tex. App.—San Antonio 1999, pet. denied). The determination of a
meeting of the minds, and thus offer and acceptance, is based on the objective
standard of what the parties said and did and not on their subjective state of mind. 
Copeland, 3 S.W.3d at 604. In determining the existence of an oral contract, the
court looks to the communications between the parties and to the acts and
circumstances surrounding those communications. Prime Prods., 97 S.W.3d at 637;
Copeland, 3 S.W.3d at 605.
          It is clear from the record in this appeal—the exhibits and the testimony—that,
during 1981 through the signing of the March 11, 1982 purchase order, Baroid was
engaged in sales efforts to persuade employees of Odeco to use its CRTSs on the
OCEAN ALLIANCE, the rig being built by Scott Lithgow, which also purchased the
equipment to use on it. Baroid’s sales efforts culminated in its submission of a
written proposal to Odeco on August 10, 1981 for a drill string compensator, chain
riser tensioning system, guideline tensioner system, taut line tensioner system, 120-ton mooring system, floating guide dolly system, and spare parts for such for the
OCEAN ALLIANCE, a revised proposal “Rev. A” on September 15, 1981, and an
alternative pricing proposal on October 14, 1981. In connection with these proposals,
Baroid also submitted to Odeco letters on December 9, 1981 and January 13, 1982
that offered a time payment plan option and touted the cost savings in connection
with the chain riser tensioner system, respectively. These negotiations between
Odeco and Baroid culminated in the Scott Lithgow purchase order on March 11,
1982, and the documents evidencing the negotiations between Odeco and Baroid



were included in the Scott Lithgow purchase order.
          Odeco cannot prove an essential element of its breach of contract case, i.e., the
existence of an offer to Odeco. The very fact that the letters between Odeco and
Baroid were included in the Scott Lithgow purchase order underscores that Odeco
negotiated on behalf of Scott Lithgow, culminating ultimately in the Scott Lithgow
purchase order. However, the letters do not evidence any independent contractual
undertaking by Baroid toward Odeco, individually. Odeco did not purchase the
CRTSs and is not a party to the sales contract.
          There is no evidence of a separate contract between Odeco and Baroid, under
which Odeco agreed to cause its rig builders to use Baroid’s CRTSs and Baroid
agreed to provide a CRTS that would meet the promised specifications and to stand
behind its product until the CRTSs performed to Odeco’s satisfaction. Indeed, it is
not a reasonable inference from the evidence presented at the trial that Baroid would
insist that its standard terms and conditions, including the one-year warranty, be
applied to the actual purchaser, Scott Lithgow, while orally conferring upon
Lithgow’s purchasing agent, Odeco, a separate five-year warranty on equipment that
Odeco did not even own. Accordingly, we hold that Odeco presented legally
insufficient evidence of a separate, oral contract between Odeco and Baroid.



          We sustain Baroid’s ninth issue on appeal.
          2. Damages
          In March 1993, five months after it filed suit in this case, Odeco purchased the
OCEAN ALLIANCE from Lloyd’s Leasing. In October 1993, Odeco retrofitted the
OCEAN ALLIANCE with a wire rope tensioning system in place of the chain riser
tensioning system. After trial, the special judge awarded Odeco $1,909,370.43 in
actual damages against Baroid, such amount representing the costs of retrofitting the
OCEAN ALLIANCE from a chain riser tensioning system to a wire riser tensioning
system. In points of error six and nine, Baroid contends that there was no evidence
that Odeco suffered damages because it purchased the OCEAN ALLIANCE, having
been made aware of the problems with the CRTS (and after filing suit), and it did not
incur any costs related to the CRTS until after the purchase..
          We agree. In Adams v. Gates Learjet Corp., the plaintiff purchased pre-owned
Learjet airplanes after certain defects were known to exist with the planes because of
actions taken by the Federal Aviation Administration. 711 F. Supp. 1377, 1382 (N.D.
Tex. 1989). The court opined that the plaintiff had suffered no damage as a matter
of law. Id. at 1383.
As to those Plaintiffs who purchased their aircraft from other vendors
after the AD’s issuance as a final rule in 1984, their claim to have
standing to bring an action for tort or contract damages can only be
described, charitably, as disingenuous. All the Plaintiffs admit that their
alleged damages “arise” from the issuance of AD-84-17-02. As to these
Plaintiffs’ alleged damages[,] only three possibilities exist: they either
paid (1) more than fair market value, (2) less than fair market value, or
(3) a price equal to fair market value for their aircraft.
 
If the Plaintiffs paid less than market value or a price equal to fair
market value, they have simply suffered no damages. With respect to
those Plaintiffs who possibly paid more than fair market value, their
damages, if any, resulted from a poorly bargained for aircraft, not from
the AD’s issuance or any act or omission on Learjet’s part. As the
Plaintiffs’ own damage experts stated, any diminution in value equal to
the cost of compliance occurred when the AD was issued. Thus, any
diminution in value occurred before these Plaintiffs’ purchased their
Model 24's and are not compensable in this lawsuit.

Id. at 1382 n.5. 

          Applying the logic of Adams to this case, we reason that the damage to the
value of the OCEAN ALLIANCE occurred in this case when the CRTS failed long
before Odeco’s purchase. At the time of the CRTS failure, Odeco was not the owner
of the OCEAN ALLIANCE; it was merely the rig operator and the purchasing agent
for the actual owner. As such, Odeco should have taken the decreased value of the
rig into account when it decided to purchase the rig.
          We also note that Odeco claims that “[Britoil] and Odeco agree that Odeco had
all rights including warranty rights pertaining to the alliance, which Odeco was
entitled to assert in its own name.” As such, Odeco contends that it had the right to
sue and recover all damages pertaining to the OCEAN ALLIANCE, even if it was not
the owner of the OCEAN ALLIANCE at the time the damages were incurred.
          However, the record clearly shows that the trial court ruled in response to a
motion for partial summary judgment filed by Baroid, that: (1) Odeco was not a party
or a third-party beneficiary to the Scott Lithgow contract, and (2) Odeco could not
recover on an assigned cause of action from Britoil. The trial court reaffirmed the
partial summary judgment in its findings of fact and conclusions of law, wherein it
stated that none of its findings of fact were intended to conflict with the previously-granted motion for partial summary judgment. Odeco never pleaded, nor proved, an
assignment by Britoil of any claim for damages that Britoil might hold, and Odeco
cannot show that it was independently damaged when it later purchased the defective
rig. 
          We also note that Odeco filed suit in this case on October 16, 1992. However,
the Deed of Covenant between Britoil and Odeco regarding the sale of the OCEAN
ALLIANCE was not signed until October 30, 1992, and Odeco did not actually
purchase the OCEAN ALLIANCE until March 1993. Even if we were to assume that
the sale of the rig effectuated an assignment of some sort, because the suit had already
been filed, Odeco would have had to comply with section 12.014 of the Texas
Property Code to make the assignment binding on Baroid. See Tex. Prop. Code
Ann. § 12.014 (Vernon 2004) (providing that, in order for transfer of a cause of
action upon which suit has been filed to be binding upon person dealing with said
cause of action, notice of transfer should be filed in papers of suit and should be
acknowledged or sworn to in form and manner required by law for acknowledgment
or swearing of deeds). No such sworn notice appears in the file of this case.
          Accordingly, we sustain Baroid’s sixth and ninth issues on appeal as they relate
to damages.
          Because we have sustained Baroid’s third, sixth, and ninth issues on appeal, we
reverse the judgment against Baroid and render judgment that Odeco take nothing
from Baroid.
C. Other Issues Relating to Odeco
          In issue one, Baroid contends that Odeco was permitted to recover based upon
an unpleaded contract. In issue two, Baroid contends that Odeco’s claims are barred
by the statute of frauds. In issue four, Baroid contends that Odeco cannot recover on
a breach of warranty claim because it never accepted the goods. In issue five, Baroid
contends that Odeco, as purchasing agent for Scott Lithgow, could not negotiate
warranties on Scott Lithgow equipment that inured to Odeco’s benefit. In issue
seven, Baroid contends that Odeco’s claims are barred by the statute of limitations. 
In issue eight, Baroid contends that the trial court erred in holding Varco Shaffer
liable, along with Baroid, because it was created as the result of an asset purchase and
had no liability under the Business Corporation Act. In issue 10, Baroid contends
that the trial court erred in failing to make additional or amended findings of fact. In
issue 11, Baroid contends that the trial court erred in finding that the attorney’ s fees
for the three plaintiffs were not capable of being segregated, and in awarding
plaintiffs 100% of their attorney’s fees. Finally, in issue 13, Baroid contends that the
settlement agreement between Odeco and Rexnord, wherein Odeco promises to
indemnify Rexnord for any claims brought by Baroid, creates a circular indemnity
that destroys Odeco’s claims against Baroid.
          In light of our dispositions of Baroid’s third, sixth, and ninth issues on appeal,
in which we reversed the judgment against Baroid and rendered judgment that Odeco
take nothing from Baroid, we need not address Baroid’s first, second, fourth, fifth,
seventh, eighth, tenth, eleventh, and thirteenth issues on appeal, and we decline to do
so.
D. Denial of Baroid’s DTPA Counterclaim
          In its twelfth issue on appeal, Baroid contends that the trial court erred by
refusing to award damages on its claim against Odeco under the DTPA. Specifically,
Baroid contends that Odeco’s claim, as a matter of law, was groundless and brought
in bad faith or for the purpose of harassment. 
          Section 17.50(c) of the Texas Business and Commerce Code provides that, on
a finding by the court that an action was groundless in fact or law or brought in bad
faith, or brought for the purpose of harassment, the court shall award to the defendant
reasonable and necessary attorney’s fees and court costs. Tex. Bus. & Com. Code
Ann. § 17.50(c) (Vernon 2002). In Donwerth v. Preston II Chrysler-Dodge, Inc., the
Texas Supreme Court held that the trial court must determine the existence of
groundlessness, bad faith, and harassment under section 17.50(c). 775 S.W.2d 634,
637 (Tex. 1989). The trial court’s determination is reviewed under an abuse of
discretion standard. Id. at 637 n.3; Ostrow v. United Bus. Machs., Inc., 982 S.W.2d
101, 106 (Tex. App.—Houston [1st Dist.] 1998, no pet.). A trial court abuses its
discretion if it acts arbitrarily and unreasonably without reference to guiding rules or
principles. Ostrow, 982 S.W.2d at 106.
          According to Donwerth, “groundless” under the DTPA means “no basis in law
or fact and not warranted by good faith argument for extension, modification, or
reversal of existing law.” 775 S.W.2d at 637. To find that a lawsuit was brought in
“bad faith,” a defendant must show that the suit was motivated by a malicious or
discriminatory purpose. W.M. Riddick v. Quail Harbor Condo. Ass’n, 7 S.W.3d 663,
667 (Tex. App.—Houston [14th Dist.] 1999, no pet.). A finding of harassment is
closely tied to a finding that the suit was groundless. Donwerth, 775 S.W.2d at 640.
          Odeco initially asserted claims for violation of the DTPA. In response, Baroid
filed a counterclaim against Odeco, alleging that Odeco’s DTPA claims were
groundless and, therefore, Baroid is entitled to reasonable attorney’s fees under
section 17.50(c). As Baroid concedes in its brief, Odeco dropped its DTPA claims
after Baroid moved for summary judgment in August 1996, more than one year before
trial. Neither the final judgment, nor any order specifically ruled on Baroid’s claim
for reasonable attorney’s fees under section 17.50(c). However, the “Mother
Hubbard” language of the final judgment effectively denied Baroid relief on its
DTPA counterclaim. Moreover, the special judge’s findings 104 and 105 read as
follows:
104.In connection with the pursuit of their claims herein, [Odeco’s]
DTPA claims were not brought in bad faith and were supported
by applicable law.
 
105.[Odeco’s] DTPA claims were not brought for the purpose of
harassment.
 
          Baroid maintains that Odeco’s DTPA claims were groundless and brought in
bad faith or for the purpose of harassment as a matter of law for three reasons. First,
Odeco was a business consumer with assets of $25 million or more, and, thus, it could
not maintain a DTPA cause of action. See, e.g., Transp. Indem. Co. v. Orgain, Bell
& Tucker, 846 S.W.2d 878, 882 (Tex. App.—Beaumont 1993), writ denied per
curiam, 856 S.W.2d 410 (Tex. 1993) (neither approving nor disapproving court of
appeals analysis of bad faith issue); see Tex. Bus. & Com. Code Ann. § 17.45(4)
(Vernon 2002). Second, when Odeco filed suit, it knew it did not own the claim;
rather, Britoil owned it. Finally, Baroid contends that Odeco was not a consumer
insofar as it acted as an agent for Scott Lithgow and did not seek or acquire any goods
or services.
          Baroid and Varco cite us to no evidence in the record indicating that Odeco
brought its DTPA claims in “bad faith,” that is, that Odeco had a malicious or
discriminatory purpose in bringing their DTPA claims. Further, in PPG Indus., Inc.
v. JMB/Houston Ctrs. Partners Ltd. P’ship, the Texas Supreme Court noted that it
had never decided the issue of whether a business consumer could pursue a claim that
arose from a contract that had been executed prior to the effective date of the 1983
amendments to the DTPA. 146 S.W.3d 79, 91 (Tex. 2004).
          Before PPG Industries, for example, the San Antonio Court of Appeals held
that the waiver provisions of the 1983 amendments to the DTPA did not apply to a
contract executed before those amendments became effective. See Gov’t Employees
Credit Union v. Fuji Photo Film U.S.A., Inc, 712 S.W.2d 208, 211 (Tex. App.—San
Antonio 1986, writ ref’d n.r.e.).
          As for the assertion that the suit was groundless because Britoil owned the
claim and Odeco was merely acting as an agent, Odeco presented the testimony of
Richard Lionberger, who testified that he believed that it was not necessary for Britoil
to assign any claims it might have had against Baroid to Odeco because Odeco
acquired those claims when it purchased the OCEAN ALLIANCE. 
          Because the law relative to the applicability of the 1983 DTPA amendments
was unsettled, Baroid cites us to no evidence of malicious or discriminatory purpose
on the part of Odeco, and Lionberger’s testimony provides some evidence that Odeco
believed it had the right to assert Britoil’s claims, we hold that the special judge did
not abuse his discretion in determining that Odeco’s claims were not brought in bad
faith, were not brought for purposes of harassment, or were supported by applicable
law.
          Accordingly, we overrule Baroid’s twelfth issue on appeal.
E. Baroid v. Rexnord
          The final judgment awarded Baroid $1,909,370.92 in actual damages, plus
interest and attorney’s fees, against Rexnord, the chain manufacturer for the CRTS.
Such amount represents the same amount Baroid was ordered to pay Odeco. In issues
14 through 16, Baroid challenges the judgment as it relates to this award. 
Specifically, in issue 14, Baroid contends that it was entitled to a credit for the $1
million Rexnord paid Odeco under the terms of their settlement. In issue 15, Baroid
contends that the trial court erred in failing to award some amount of each element
of damages for the claims against Rexnord. And, in issue 16, Baroid contends that
the trial court erred in denying its indemnity claim and negligent misrepresentation
claim.
          However, in its separate appeal, Rexnord contends that the trial court erred in
granting any judgment for Baroid for “independent claims” because they were never
pleaded. We agree with Rexnord. After reviewing Baroid’s cross-claims against
Rexnord, we conclude that Baroid did not assert any independent causes of action
against Rexnord, but rather only derivative claims for indemnity or contribution. 
Each of Baroid’s causes of action asserted against Rexnord was contingent on a
liability finding to Odeco.


 Because we have reversed and rendered Odeco’s
judgment against Baroid, we must necessarily do the same here. Accordingly, we
sustain Rexnord’s second issue on appeal. Because we sustain Rexnord’s second
issue, we need not address Baroid’s fourteenth, fifteenth, and sixteenth issues, and
decline to do so. We reverse the judgment in favor of Baroid and against Rexnord
and render judgment that Baroid take nothing from Rexnord.
 
 
THE ODECO APPEAL
A. Maintenance and Chain Replacement Costs for the OCEAN ALLIANCE
          In its first issue on appeal, Odeco contends that the trial court should have
awarded it not only damages for the costs of retrofitting the OCEAN ALLIANCE, but
also damages for its increased maintenance and chain replacement costs. Inasmuch
as we have already held that Odeco was not entitled to recover any damages from
Baroid for the expenses incurred in retrofitting the Alliance because there was no
contract between the two parties, we also conclude that Odeco was not entitled to
recover for the increased maintenance and chain replacement costs associated with
the OCEAN ALLIANCE. Accordingly, we overrule Odeco’s first issue on appeal.
B. Damages for the OCEAN VALIANT and OCEAN AMERICA
          In issues two and three, Odeco contends that the special judge erred by refusing
to award it damages associated with the CRTSs that were placed on two other
rigs—the OCEAN VALIANT and the OCEAN AMERICA. Odeco argues that “the
same warranty” that applied to the OCEAN ALLIANCE also applied to the OCEAN
VALIANT and the OCEAN AMERICA and that the special judge’s findings of fact
regarding the existence of an oral contract between Odeco and Baroid, which were
used to support an award for the retrofitting of the OCEAN ALLIANCE, would also
support an award for the costs of retrofitting the OCEAN VALIANT and the OCEAN
AMERICA.



          However, we have already held that there was no oral contract between Odeco
and Baroid for the OCEAN ALLIANCE. Inasmuch as Odeco is relying on “the same
warranty,” for which we have found legally insufficient evidence of its existence, we
also overrule Odeco’s second and third issues on appeal.
          We affirm the judgment as it relates to Odeco’s claims against Baroid.
CONCLUSION
          Because we have held that Odeco’s recovery of damages from Baroid is (1)
barred by the parol evidence rule (2) and is supported by legally insufficient evidence
of (a) the existence of an oral agreement between Baroid and Odeco, wherein Baroid
warrantied to Odeco that it would “stand behind” the CRTSs Baroid sold to Scott
Lithgow, and (b) damages to Odeco caused by the sale of the CRTSs to Scott
Lithgow, we reverse the judgment against Baroid and render judgment that Odeco
take nothing from Baroid on its claims.
          Because we have held that the trial court did not abuse its discretion in failing
to award damages on Baroid’s DTPA counterclaim against Odeco, we affirm that
portion of the judgment.
          Because we have held that all of Baroid’s claims against Rexnord were
contingent on a finding that Baroid was liable to Odeco, and because we have held
that Baroid is not liable to Odeco, we reverse the judgment as it relates to Baroid’s
cross-claims against Rexnord and render judgment that Baroid take nothing from
Rexnord.
 
 
 
 
 
 
 
 
          Because we have held that there is legally insufficient evidence of the existence
of an oral agreement between Baroid and Odeco, wherein Baroid warrantied to Odeco
that it would “stand behind” the CRTS Baroid sold to Hyundai, we affirm the portion
of the judgment that denies Odeco’s recovery from Baroid on its claims relating to the
OCEAN VALIANT and the OCEAN AMERICA.
 
 
                                                                        Sherry Radack
                                                                        Chief Justice

Panel consists of Chief Justice Radack and Justices Nuchia and Bland.