**Opinion issued June 12, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00868-CV

————————————

## PATRICIA CANTU, Appellant

## V.

## FRYE & ASSOCIATES, PLLC, PHYLLIS R. FRYE, AND SALVADOR BENAVIDEZ, Appellees

———————————————————————————————

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-66038**

———————————————————————————————

## MEMORANDUM OPINION

After the trial court resolved this case on cross-motions for summary judgment, appellant Patricia Cantu appealed the judgment entered in favor of the appellees, Frye & Associates, PLLC, Phyllis R. Frye, and Salvador Benavidez. In

three issues, she argues that summary judgment should not have been granted as to her causes of action and that summary judgment should have been granted in her favor with respect to appellees' counterclaims.

We affirm.

## Background

Patricia Cantu joined the law firm of Simoneaux and Frye, PLLC as an associate attorney. Attorneys Jerry Simoneaux and Phyllis Frye each owned a 50% interest in the firm. Approximately eight months after Cantu became an associate, Simoneaux decided to sell his ownership interest and leave the law firm. Cantu became a partner by purchasing from Simoneaux a 30% ownership interest in the firm. Frye purchased an additional 10% interest, and Salvador J. Benavidez purchased the remaining 10%.

On October 8, 2008, Simoneaux and Frye, the two managers of the firm, held a special meeting at which Cantu and Benavidez were admitted as members and Simoneaux resigned as manager. A special meeting of the members was also held that day. The minutes of that meeting stated the partners' ownership interests as: Frye 60%, Cantu 30%, and Benavidez 10%. The minutes state that the firm's name would be changed to Frye and Cantu, PLLC; that it would continue to be governed by the Company Agreement which was adopted in 2007 by the firm then known as Simoneaux, Frye, and Thomason and later known as Simoneaux and

2

Frye; and that profits and monthly earnings would be shared as set forth in the minutes. The minutes were signed by Frye, Cantu, and Benavidez.

Among other things, the Company Agreement provided that the firm should have at least one manager. Because Simoneaux resigned as manager and no other person was appointed manager, Frye remained as the firm's sole manager. According to the Company Agreement, the manager had "the sole and exclusive control of the management, business and affairs of the Company," including, among other things "selecting and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants." The Company Agreement provided the firm with certain remedies for a member's default, including "forfeiture of the Defaulting Member's Membership Interest," and it established a procedure for expulsion of a member for cause:

> 15.04 **Expulsion.** A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company; or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled member against any amounts distributable or otherwise payable by the Company to the expelled Member.

3

Over the course of the year following Cantu's purchase of an ownership interest in the firm, she used the law firm's debit card for numerous personal expenses, totaling $8,468.63. In her deposition, Cantu admitted that she had never discussed the personal use of the firm debit card with Frye or the office manager, Jeffrey Forbes. She testified that the law firm had no policy prohibiting the use of the firm's debit card for personal expenses, "just so long as it was repaid . . . on payday."

Meanwhile, Cantu's clients were not paying their bills. Cantu explained how her clients' nonpayment of their bills related to her use of the firm's debit card for her personal expenses:

> The income that I was receiving from the firm, the money wasn't coming in because the collections weren't being done . . . I even tried sending letters with the invoices trying to get people . . . to pay. And so . . . I would use the card . . . as an advancement, and then pay it back when I got paid.

Cantu's paycheck continued to shrink. In various pleadings, in her affidavit, and at her deposition, Cantu said that her outstanding accounts receivable were not collected because Forbes failed or refused to collect the fees in her cases.

In addition, the undisputed evidence was that Cantu did not repay her personal use of the debit card in full each payday. She testified as follows:

> Q.   Well, you didn't actually pay it back when you got paid, because by October of 2009, you were down almost $9,000, and it was going up every month.

4

A. That's right, because my check was getting smaller.

Q. Right. And your check was getting smaller because your clients weren't paying their bills, right?

A. Right. But I was still working.

Q. Right. But did anyone at the law firm authorize you to use the debit for your own personal expenses to the tune of $2,000 a month, because your clients weren't paying their bills?

A. I didn't ask anyone.

Q. Well, what made you think it would be okay for you to do that then?

A. Because I was an owner of the company.

Q. So, in—your mind-set, as you're doing this, was that you were 30-percent owner, so you could use the firm debit card for whatever you wanted and pay them back whenever you felt like it, right?

A. Sure.

According to her affidavit, Frye first learned of Cantu's use of the debit card for personal expenses on October 7, 2009. That day, she sent Cantu an email accusing her of using "the firm's debit card to bilk the firm in the amount of $8,468.63—in less than six months—since April 13, 2009. . . . for such things as music, ice cream, groceries, meals, clothing, medicine, cash and your health insurance premiums or co-pays." Frye denied having given Cantu permission to use the debit card in this manner. She also averred that she first learned that same day that Cantu had more than $33,239.52 in outstanding fees owed to the firm,

5

which she characterized as "very past due or uncollectable." Frye closed Cantu's debit card, changed the office locks, and instructed Cantu to resign from the firm and vacate her office within two days. She also told Cantu that her portion of outstanding client fees would be credited toward what she owed the firm and that she had until the end of November 2009 to repay an unrelated personal loan. Finally, Frye warned that if Cantu did not repay the money by November 2009, then she would file criminal charges with the police and district attorney, file a complaint with the State Bar "to have your license suspended," and approach "every judge that you get work from and let them know that you stole money from our firm."

Cantu did not resign, and on October 13, 2009, the firm held a meeting where Frye and Benavidez voted to expel her pursuant to Article 15.04 of the Company Agreement. The minutes of that meeting state, "The vote was unanimous as prescribed by Section 15.04." The minutes reflect that Cantu was "expelled" from the firm, that she had "zero membership interest," that she had until the end of the month to provide letters from clients who wished to follow her so that she could take their files and trust accounts, and that the usual split of fees between her and the firm remained through the end of the month.

Cantu repaid the money owed by August 16, 2010. Two months later, she filed suit against Frye & Associates, PLLC (the successor to Frye and Cantu,

PLLC), plus Frye and Benavidez individually. She alleged causes of action for: (1) civil theft; (2) statutory and common-law fraud, in connection with her purchase of stock in the firm; (3) common-law fraud, in connection with her expulsion from the firm; and (4) conspiracy and aiding and abetting, in connection with her expulsion from the firm.[1] Frye, Benavidez, and the law firm counterclaimed for the bringing of a frivolous lawsuit, breach of fiduciary duty, and theft of property.

Approximately one year later, the appellees filed a no-evidence motion for summary judgment on the grounds that there was no evidence of any false representation, reliance thereon, or damages that would support Cantu's claims for statutory or common-law fraud. The motion also argued that there was no evidence of any underlying tort or damages to support her conspiracy and aiding and abetting causes of action.

Instead of responding with summary-judgment evidence, Cantu filed three motions to compel discovery, moved for a continuance of the no-evidence motion for summary judgment, and noticed the depositions of Benavidez and Forbes. However the depositions were quashed because they were scheduled days before Christmas and without any consultation with the witnesses as to their availability.

---

[1] She also sued for defamation. The trial court granted summary judgment in the appellees' favor as to the defamation claims, and Cantu does not challenge that ruling on appeal.

The appellees amended their answer and counterclaims, adding claims for breach of contract and unjust enrichment. Cantu filed a no-evidence motion for summary judgment as to the counterclaims. In February 2012, the appellees responded to her no-evidence motion for summary judgment and filed another motion for summary judgment on her claims, arguing both traditional and no-evidence grounds.

In their second no-evidence summary-judgment motion, the appellees argued that there was no evidence of: (1) any appropriation of Cantu's property, (2) any damages caused by such an appropriation, or (3) any wrongful taking of Cantu's property. The motion for summary judgment stated that her "'misappropriation' claim fails as a matter of law," that there was no evidence of causation in regard to Cantu's purchase of an interest in the firm, and that "nothing they did or failed to do is a cause of [her] purchasing her interest, or a cause of her paying too much or too little for that interest." They alleged that conspiracy and "aiding and abetting" were derivative claims and that there was no evidence that they had engaged in any tort or wrongful action to which conspiracy or "aiding and abetting" could apply. In addition, they argued that it was "unclear how shareholders could ever fit under the umbrellas of co-conspirators with the company that they own," but in any event, there was "no evidence of any conspiracy, and no evidence of any damages caused by the alleged conspiracy."

8

In their traditional motion for summary judgment, the appellees asked the court to take judicial notice of its file, including business records of the firm. They argued that the entity "can have done nothing to harm [Cantu] with respect to her ownership interest." They argued that because Cantu had all the knowledge the entity had, there could be no cause of action or recovery against the entity itself. They also argued that the "summary judgment proof establishes that the rules of the entity were complied with and therefore there can be no claim against the individual other owners that compliance with the rules somehow damaged the Plaintiff." They attached the following summary-judgment evidence:

- minutes of the October 8, 2008 meeting;

- the Company Agreement;

- the October 7, 2009 email from Frye to Cantu, with account statements showing Cantu's use of the debit account for personal expenses and summaries of her uncollectible accounts receivable;

- minutes from the October 13, 2009 meeting when Cantu was expelled; and

- excerpts from the *Texas Bar Journal* showing a prior disciplinary action against Cantu.

Cantu did not respond with summary-judgment evidence. Rather, she amended her petition to add claims for conversion and "fraud by nondisclosure," and to revise the aiding-and-abetting claim to one for "conspiracy and participating, assisting or encouraging theft and fraud." She also added "vicarious

liability—respondeat superior" as a theory of the firm's liability. Then she filed motions to compel additional discovery, and the ensuing discovery disputes occupied the better part of two months.

After Cantu's deposition in March 2012, the appellees supplemented their motion for summary judgment, arguing that the summary-judgment evidence conclusively showed that Cantu was lawfully expelled from the firm for wrongfully using the firm's funds. In addition to documents previously attached to the summary-judgment motion, they also included excerpts from Cantu's deposition.

Cantu responded to the motions for summary judgment with objections and evidence. She argued that the no-evidence motion lacked specificity, noting that the appellees referred to her "misappropriation" claim and arguing that she did not bring a claim for "misappropriation." She objected to appellees' failure to "reference any specific evidence in support of their motion," their request that the court take judicial notice of their business records, and Frye's affidavit. As summary-judgment proof, she attached several pleadings and an affidavit sworn approximately three weeks after her deposition. She averred that with respect to her purchase of a share in the firm from Simoneaux, she relied on the following representations made by Frye: that she would be an equal partner except in regard to percentage ownership; that she would have access to research and educational

10

materials and administrative staff; and that the office manager would help her with appointments, scheduling, and collection of fees. In her affidavit, Cantu stated that she did not read the "exhaustive Company Agreement" because she "*relied* on Frye's representations" that she would be an equal partner except in regard to percentage ownership. Cantu averred, "She explicitly told me that I could *rely* on her and unilaterally opted to change the name of the company to Frye and Cantu, PLLC thus assuring me that what she was telling me was true."

In her affidavit, Cantu also stated that all of the members of the firm used their debit cards for personal expenses. As to her use of the debit card, she asserted:

> It is not true that I needed permission from Phyllis Frye to use my debit card for purchases or cash withdrawals. As owner of the company, I was entitled to use the debit card assigned to me. I was not the only one who had a debit card. Phyllis Frye, Salvador Benavidez and Jeffrey Forbes all had debit cards. A review of the operating account statement produced by the defendants shows that every person who had a debit card used it for both business and personal reasons.

The operating account statement to which she refers was not attached as summary-judgment evidence. She also averred that her accounts receivable had not been collected because Forbes had not done his job and that Frye violated the Company Agreement by construing section 15.01(g) out of context in connection with her expulsion from the firm. As to the wrongfulness of her expulsion, Cantu attested:

11

Frye and Benavidez accused me of having breached the Firm's "bylaws" and that the breach subjected me to expulsion and forfeiture of my ownership interest in the Firm. Frye put the matter to a vote and she and Benavidez immediately voted to formally expel me from the Firm and to divest me of my 30% ownership interest without compensation because, according to them, I was guilty of fraud, theft and gross negligence against the Company or one or more Members of the Company. Frye and Benavidez aiding and abetting each other, and in furtherance of their conspiracy, effectively defrauded me of my ownership interest in the Firm, tortuously [*sic*] interfered with the operation of my law practice and tried to take my clients away from me.

She attached the following documents to her affidavit:

- the Company Agreement;

- account statements that show her income from legal fees with deductions made each month for such things as "cash advance" and "reimbursables" and notations such as "total owed to firm;"

- a letter from Frye and Associates, PLLC dated August 16, 2010 showing that she paid her debt to the firm in full;

- a transcript of an audiotape she made of the October 13, 2009 meeting;

- a summary of her accounts receivable showing many had been written off by the firm because the clients refused to pay; and

- the October 7, 2009 email from Frye to Cantu.

Cantu filed a separate response to the traditional motion for summary judgment. In it, she objected to the request that the court take judicial notice of business records filed in the case, the appellees' failure to "incorporate by reference" Frye's affidavit (arguing that their identification of the exhibit was

insufficient and asking the court to strike the affidavit), and the substance of Frye's affidavit as "unsubstantiated opinion" that was conclusory as to Cantu's use of the debit card being for personal expenses. Cantu again attached her affidavit with exhibits as controverting summary-judgment evidence. As to the motion itself, she argued that it was conclusory and not sufficiently specific to give her fair notice of the appellees' contentions with regard to her causes of action.

After further discovery disputes, the trial court granted summary judgment in favor of the appellees, who then nonsuited their counterclaims. The appellate record does not include a transcript from any summary-judgment hearing. The summary judgment order does not specify the grounds upon which it is based or which of the various motions was granted. It simply states, "Came to be heard Defendants' Motion for Summary Judgment and the Court, after reviewing the pleadings of the parties and oral hearing arguments, is of the opinion that the motion is meritorious and therefore GRANTED." Cantu filed a motion for new trial in which she reiterated her objections to the form of the motions for summary judgment, to the request for the court to take judicial notice of business records on file with the court, and to the form and substance of Frye's affidavit. Cantu asked the court to rule on her objections and grant her a new trial. The trial court denied Cantu's motion for new trial and did not rule on her evidentiary objections. Cantu appealed.

**Analysis**

## I. Appellees' motions for summary judgment

The appellees filed three motions seeking summary judgment in this case. The first was a motion filed in October 2011. The court granted that motion in part, as to the defamation claims, but it did not rule at that time on the other grounds for summary judgment included in that motion, i.e., appellees' no-evidence summary judgment grounds as to Cantu's other causes of action. The second motion for summary judgment was filed in February 2012, and the third was a supplemental motion filed in March 2012. The grounds and arguments in these summary-judgment motions are not identical.

In her first two appellate issues, Cantu challenges the trial court's summary judgment on both traditional and no-evidence grounds, with specific reference to the February and March 2012 motion and supplement. She challenges the sufficiency of both motions, and she argues that the summary-judgment evidence presented a genuine issue of material fact sufficient to defeat summary judgment.

The purpose of a traditional motion for summary judgment is not to deprive a litigant of his right to trial by jury, but to eliminate patently unmeritorious claims. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n.5 (Tex. 1979). The party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a

matter of law. TEX. R. CIV. P. 166a(c); *see also Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

A no-evidence motion for summary judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006). A party may move for no-evidence summary judgment if, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which the nonmovant would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). The motion must state the elements as to which there is no evidence. *Id.* The reviewing court must grant the motion unless the nonmovant produces summary-judgment evidence raising a genuine issue of material fact. *Id.*; *Mack Trucks*, 206 S.W.3d at 582. A genuine issue of material fact exists if the nonmovant produces evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005)).

We review de novo the trial court's ruling on a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Grounds for summary judgment must be stated in the motion. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342–43 (Tex. 1993). If the summary judgment does not specify the grounds on which it was granted, the appealing party must demonstrate that none of the proposed grounds is sufficient to support the judgment. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989). A reviewing court considers the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc.*, 289 S.W.3d at 848. A matter is conclusively established if reasonable people could not disagree as to the conclusion to be drawn from the evidence. *City of Keller*, 168 S.W.3d at 815–16.

To preserve objections to the form of summary-judgment evidence for appeal, a party asserting the objections must obtain a ruling at or before the summary-judgment hearing. *Vice v. Kasprzak*, 318 S.W.3d 1, 11 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see* TEX. R. APP. P. 33.1(a)(1); TEX. R. CIV. P. 166a(f). "[A] trial court's ruling on an objection to summary-judgment evidence is not implicit in its ruling on the motion for summary judgment." *Delfino v. Perry*

*Homes*, 223 S.W.3d 32, 35 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Well Solutions, Inc. v. Stafford*, 32 S.W.3d 313, 317 (Tex. App.—San Antonio 2000, no pet.)). Objections to hearsay, improper authentication, or lack of foundation are defects in form, which require a ruling for appellate review. *Williams v. Bad–Dab, Inc.*, No. 01–11–00102–CV, 2012 WL 3776347, at *6 (Tex. App.-Houston [1st Dist.] Aug. 30, 2012, no pet.) (mem. op.); *see Grand Prairie Indep. Sch. Dist. v. Vaughan*, 792 S.W.2d 944, 945 (Tex. 1990) (per curiam) (lack of personal knowledge is defect in form); *Stewart v. Sanmina Tex. L.P.*, 156 S.W.3d 198, 207 (Tex. App.—Dallas 2005, no pet.) (hearsay is defect in form). A defect of substance, such as an objection that statements in an affidavit are conclusory, may be raised for the first time on appeal. *See Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 130 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

In this case, Cantu's petition included causes of action for conversion, theft, statutory and common-law fraud based on two separate factual allegations, conspiracy, and aiding and abetting. The appellees filed three different motions for summary judgment, which identified both traditional and no-evidence grounds, at times raising legal arguments to negate more than one of Cantu's causes of action. Cantu responded separately to the appellees' traditional and no-evidence motions, presenting identical summary-judgment evidence. On appeal she challenged both

17

the form of the February and March 2012 motions and the merits of the court's ruling.

We address the arguments and evidence on a claim-by-claim basis to determine if the trial court's grant of summary judgment was properly based on any expressed ground as to each cause of action that comprises a part of Cantu's lawsuit.

## A. Conversion and theft claims

Cantu argues that the trial court erred by granting the appellees' traditional motion for summary judgment on her claims for conversion and theft. She also contends that the no-evidence motion for summary judgment on these claims was legally inadequate because it did not identify the causes of action for conversion and theft and instead referred to her "misappropriation claims."

The motion argued that these claims fail because the evidence conclusively established that Cantu was lawfully expelled from the firm. Cantu first argues that the trial court erred in granting summary judgment on traditional grounds because the motion fails to state the ground upon which it is made. She relies on *Golden Triangle Energy v. Wickes Lumber*, 725 S.W.2d 439 (Tex. App.—Beaumont 1987, no writ), for the proposition that the grounds for summary judgment must be specifically stated in the motion and cannot be supplied by a general prayer for relief. *Golden Triangle Energy*, 725 S.W.2d at 441. We, of course, find no cause

18

for debate with this statement of black-letter law. *See* TEX. R. CIV. P. 166a; *Richards v. Transocean, Inc.*, 333 S.W.3d 326, 329 (Tex. App.—Houston [1st Dist.] 2010, no pet.). However, we disagree with Cantu's contention that the motion failed to state the ground upon which it was made.

Among other things, Cantu pleaded causes of action for conversion and theft. Conversion is the wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Burns v. Rochon*, 190 S.W.3d 263, 267–68 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)); *see Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 108–09 (Tex. App.—Houston [1st Dist.] 2013, no. pet.). To establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned, possessed, or was entitled to possess the property; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Burns*, 190 S.W.3d at 268.

Likewise, a person commits theft if she unlawfully appropriates property with intent to deprive the owner of it. TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2012); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 134.002(2) (theft is

19

defined by the Penal Code). To appropriate property means "to acquire or otherwise exercise control over property other than real property," or to transfer title to property to one other than the property's owner. TEX. PENAL CODE ANN. § 31.01(4).

For both causes of action, there is a common element that the defendant must have acted unlawfully in taking or appropriating the property interest. Considering that this argument, which was raised in the motion for summary judgment, specifically applies to Cantu's conversion and theft claims, we hold that the grounds were sufficiently specific. *Cf. Nall v. Plunkett*, 404 S.W.3d 552, 556 (Tex. 2013) (traditional summary-judgment motion arguing specifically that Texas does not recognize social-host liability and generally that defendants owed no duty to plaintiff was specific enough to include negligent-undertaking claim).

On the merits, Cantu's argument appears to be that the appellees acted improperly in expelling her from the firm because there was a lack of proof that she committed fraud, theft, or gross negligence, as provided in the "Expulsion" clause of the Company Agreement, Section 15.04. The appellees presented as summary-judgment evidence excerpts from Cantu's deposition in which she admitted using the company debit card for personal expenses. And she said that as a part owner, she was entitled to use the debit card for personal expenses and repay the firm at her pleasure, though she also admitted that she had no permission or

20

agreement from any other member to do so. The appellees also presented the minutes of the October 2009 meeting showing that the members were present, that Frye moved for Cantu's expulsion under Section 15.04(b), and that both Frye and Benavidez voted to expel Cantu from the firm.[2]

The Company Agreement does not define fraud, theft, or gross negligence. Theft is defined by the Texas Penal Code as the unlawful appropriation of property with intent to deprive the owner of it. *See* TEX. PENAL CODE ANN. § 31.03(a). To appropriate property means "to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4). Intent to deprive the owner of the property is evaluated at the time of the offense, and evidence of actual deprivation may be

---

[2]     Cantu argues that Frye's affidavit contains an "unsubstantiated factual conclusion" with respect to her expulsion from the firm, and that it therefore is not competent summary-judgment evidence. The contention that a portion of an affidavit submitted as summary-judgment evidence was conclusory is an objection to the substance of the affidavit, which we must address. *See Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 130 (Tex. App.— Houston [1st Dist.] 1999, no pet.). The disputed statement summarizes the minutes of the meeting, as to which Cantu has made no objection. However, because Frye's statement provides the underlying facts—the meeting minutes—based upon her own personal knowledge, we hold that it is not conclusory as to any factual assertion, and we overrule Cantu's objection. To the extent we can infer that Cantu also complains that the affidavit embodies a legal conclusion as to the validity of the board's action, the bylaws did not require a specific quantum of proof to substantiate an allegation of theft, fraud, or other action that subjected a partner to expulsion. All that was required was a unanimous vote by the members other than the member being expelled, and the summary-judgment proof shows that this was satisfied.

21

evidence of intent to deprive. *See Rowland v. State*, 744 S.W.2d 610, 612 (Tex. Crim. App. 1988).

Here, the appellees' summary-judgment evidence showed that Cantu appropriated company funds by using the debit card for personal expenses; that she did so without consent of the company, a manager of the company, a majority of the members, or in accordance with the distribution provisions in the Company Agreement; and that she actually deprived the company of the money, which is evidence of intent. The evidence shows that the two other members of the company, Frye and Benavidez, voted to expel her, in conformity with the Company Agreement. Finally, the Company Agreement provides a choice of remedies under Section 15.01. Forfeiture is identified as a remedy for the default of a member under Section 15.01(g).

Cantu presented her own affidavit as controverting summary-judgment evidence. In it, she averred that she did not need permission and was entitled to use the debit card for personal expenses because she owned 30% interest in the firm. She averred that contrary to the contents of the minutes from the October 2009 meeting, it was not a regularly called meeting, but a specially called meeting. And she alleged that her expulsion was not done in accordance with the by-laws:

> Additionally, Article XV of the Company Agreement refers to the default of a member for failure to contribute. Section 15.01(g) is a remedy provided under Article XV when a member does not contribute by the time required or all or any portion of a Capital

22

Contribution that member is required to make in the Company Agreement. Frye violated the Company Agreement when she deliberately took Article XV, Section 15.01(g) out of context and used it for her personal benefit to expel me from my own company. My expulsion was not according to the by-laws, and the meeting and voting were a sham by Frye and Benavidez to rob me of my ownership interest in the company.

Although Cantu's summary-judgment evidence offers her differing interpretation of the Company Agreement, we find no evidence that actually contradicts the appellees' summary-judgment evidence in this regard. To the contrary, we conclude that the summary-judgment evidence conclusively shows that the appellees' actions in expelling Cantu and forfeiting her interest were not unlawful.[3] Section 15.04 of the Company Agreement incorporated the remedies of Section 15.01 by reference. Cantu's affidavit is consonant with the appellees' summary-judgment evidence that they held a meeting, confronted her with the allegations of theft and gross negligence, voted "unanimously" (as defined in the Company Agreement) to expel her, and forfeited her ownership interest as provided for in Section 15.01(g).

---

[3] Cantu also argues that the court erred by not ruling on her objections to the following summary-judgment evidence: (1) the request for the court to take judicial notice of its file, (2) the failure of the appellees to incorporate Frye's affidavit by reference, (3) best evidence rule objections pertaining to Frye's statements about Cantu's purchases, and (4) hearsay statements in Frye's affidavit. Cantu did not secure a ruling on these objections prior to the rendition of summary judgment. Therefore, she did not preserve error as to any objections to the form of the summary-judgment evidence. *See* TEX. R. APP. P. 33.1(a)(1); *Vice v. Kasprzak*, 318 S.W.3d 1, 11 (Tex. App.— Houston [1st Dist.] 2009, pet. denied).

Accordingly, we conclude that the trial court correctly granted summary judgment as to Cantu's conversion and theft claims.

## B. Statutory and common-law fraud claims

Cantu pleaded causes of action for common-law and statutory fraud. The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). The Texas Business and Commerce Code establishes a cause of action for fraud in a transaction involving stock in a corporation or joint-stock company, the elements of which are: (1) a false representation of a past or existing material fact, which is (2) made to a person for the purpose of inducing that person to enter into a contract, and (3) relied on by that person in entering into that contract. TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2012).

On appeal, Cantu argues that the trial court erred by granting summary judgment on no-evidence grounds, but she does not specifically refer to the

appellees' December 2011 motion for summary judgment, which argued in connection with these claims that there was no evidence:

- "that any of the Defendants made a representation to Cantu that was false";

- "that Cantu relied upon statements made by Ms. Frye, Mr. Benavidez, or the law firm of Frye and Associates"; or

- "that Cantu suffered an[y] damages as a result of anything that she was allegedly told."

Cantu's summary-judgment evidence included an affidavit in which she averred that Frye made representations upon which she relied in connection with her purchase of an ownership interest in the law firm. Specifically, she stated:

> [P]rior to purchasing my ownership interest from Jerry Simoneaux, Frye told me she had exclusive rights to purchase all of Simoneaux's interest, but that she especially wanted my skills and my participation in the company because I was a productive and conscientious lawyer. She told me that my ownership interest entitled me to the full benefits of the company's resources, which included high standards of research materials and education and the full complement of administrative staff. I relied on Frye's representations.

She also averred that she did not owe the firm $33,239.52 in outstanding fees, but that she and the firm together had $33,239.52 in accounts receivables. She stated that the office manager refused to collect those fees with the approval and guidance of Frye and Benavidez, that she informed Frye of the office manager's lack of support and insubordination, and that despite her earlier promises, Frye refused to provide Cantu with support for her collection efforts. In addition, Cantu averred

that she had contributed $39,992.41 to the firm during the time that she was a member.

The summary-judgment evidence suggests that Frye did not follow through on the representations that she made and upon which Cantu contends that she relied when purchasing Simoneaux's interest in the firm. But the summary-judgment evidence does not show that the statements were false at the time that they were made. In response to appellees' motions for summary judgment, which included specific no-evidence allegations pertaining to the elements of her fraud claims, Cantu brought forth no evidence that Frye or the other appellees made any promises without the intent to perform. Moreover, the Company Agreement included a merger clause which stated that it "includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written." In light of this provision, the oral representations referenced by Cantu made before her purchase of Simoneaux's partnership interest had no legal effect,[4] and therefore

---

[4] One effect of a merger clause in this circumstance is to invoke the substantive doctrine of the parol evidence rule, such that all prior negotiations and agreements with regard to the same subject matter are excluded from consideration, whether they were oral or written. *See, e.g.*, *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 796 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 178 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *see also Restatement (Second) of Contracts*

her affidavit constituted no evidence of an actionable misrepresentation. Accordingly, we hold that the trial court correctly granted summary judgment as to these claims. *See* TEX. R. CIV. P. 166a(i); *Mack Trucks*, 206 S.W.3d at 581–82; *see also Clear Creek Basin Auth.*, 589 S.W.2d at 678 n.5 (summary judgment is tool to eliminate patently unmeritorious claims); *cf*. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) (evidence showing only breach of contract does not demonstrate intent not to perform at time promise made or support claim for fraud); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006) (same). We overrule Cantu's issues as to her fraud causes of action.

## C. Conspiracy, aiding and abetting claims

Finally, as to Cantu's conspiracy claims, the appellees alleged that there was "no evidence of any underlying tort to which the charge of 'aiding and abetting' would apply." They argued that both conspiracy and aiding and abetting are derivative claims and "there is no evidence of any underlying wrongful action to which it might be said that the individual defendants or the entity defendant could be found responsible." Finally they argued that it was "unclear how shareholders could ever fit under the umbrellas of co-conspirators with the company that they

---

§ 215 (1981). "The rule is particularly applicable when the written contract contains a recital that it contains the entire agreement between the parties or a similarly-worded merger provision." *Baroid Equip*., 184 S.W.3d at 13.

own," but in any event, there was "no evidence of any conspiracy, and no evidence of any damages caused by the alleged conspiracy."

Cantu's conspiracy claim related only to her complaint about being expelled from the firm, and did not relate to her other complaint about being fraudulently induced to buy an ownership interest in the firm. Her live pleading at the time that the trial court ruled on the motion for summary judgment alleged:

### Conspiracy and Participating, Assisting or Encouraging Theft and Fraud

39.    The conduct described in ¶¶7 to through 21, inclusive, as if fully set forth herein, which clearly establish that the Defendants participated with and assisted or encouraged each other to deprive Cantu of her ownership interest in the Firm by fraud, by violating the Theft Liability Act and converting her ownership interest . . . . Moreover, the Defendants are jointly and severally liable for all of Cantu's damages because they conspired to divest her of her ownership interest in the Firm. They had a meeting of the minds on the object of the course of action against Cantu; they each committed one or more unlawful, overt act against Cantu; and Cantu has suffered injury as a proximate result.

40.    Defendants Frye and the Firm devised and set the scheme to defraud and divest Cantu of her ownership into motion. Defendant Benavidez had sufficient information to know that the conduct of Frye and the Firm constituted a tort against Cantu. Benavidez intended to, and did assist Frye and the Firm, in committing the tort against Cantu. Benavidez intended to, and did assist Frye and the Firm, in committing the tort against Cantu. Benavidez gave Frye and the Firm assistance and/or encouragement and the assistance and/or encouragement was a substantial factor in causing the tort.

To prove civil conspiracy, a plaintiff must show that the defendant participated in an underlying tort for which he seeks to hold at least one named

28

defendant liable. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). We have already explained that the appellees have proven as a matter of law that the expulsion was properly done and Cantu's summary-judgment evidence does not refute that holding. Her conspiracy cause of action is based entirely on the actions taken in connection with her expulsion from the firm. There are no references to her fraud allegations that the appellees' misrepresentations induced her to purchase her 30% interest in the firm. Accordingly, we hold that the trial court correctly granted summary judgment in the appellees' favor on this cause of action.

## II.  Cantu's no-evidence motion for summary judgment

In her third issue, Cantu argues that the court erred in not granting her no-evidence motion for summary judgment as to the appellees' counterclaims. There is no order in the record granting or denying Cantu's no-evidence motion for summary judgment. It is axiomatic that to preserve error for appeal, a party must obtain a ruling from the trial court. *See* TEX. R. APP. P. 33.1(a); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007) ("Preservation of error generally depends on 'whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.'") (quoting *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)). Because Cantu did not obtain a ruling from the trial court on her motion for summary judgment, this issue is waived. We overrule Cantu's third issue.

**Conclusion**

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.